**In re 360 INNS, LTD., a Texas Limited Partnership, Debtor.**

**Bankruptcy No. 486–42247.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

June 16, 1987.

574

Michael A. McConnell, Kelley, Appleman, Hart & Hallman, Fort Worth, Tex., for 360 Inns, Ltd.

Gerrit M. Pronske, Pulliam, Hale, Spencer, Goodman, Stanley, Pronske & Trust, P.C., Dallas, Tex., for UNUM Life Ins. Co.

Kenneth Stohner, Jr., Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for InterFirst Bank Dallas, N.A.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On February 17, 1987, in Forth Worth, Texas, there came on for consideration the plan of reorganization filed December 17, 1986, on behalf of the debtor, 360 Inns, Ltd., hereinafter referred to as the debtor. At the time of this hearing, an objection to

confirmation and motion to dismiss had been filed by a secured creditor, Union Mutual Life Insurance Company, hereinafter referred to as UNUM or Union Mutual. At said hearing, the Court received testimony and heard oral arguments from the attorneys representing both the debtor and UNUM. In addition, InterFirst Bank Dallas, N.A., hereinafter referred to as InterFirst, had filed an objection to the confirmation of the debtor's plan, but withdrew said objection at the hearing subject to the debtor's modification of its plan in conformity with an agreement that had been reached between the debtor and InterFirst. At the conclusion of the hearing, the Court took under advisement the confirmation of the plan, as well as, the objection to confirmation and motion to dismiss filed by UNUM. Pursuant to permission granted from the Court, the debtor and UNUM agreed to the submission of additional memoranda of law on the issues presented at the hearing, as well as, the filing of additional pleadings, including a modified plan of reorganization which has now been filed by the debtor.

## I.

The Court has jurisdiction of the subject matter and the parties to these proceedings pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. These are core proceedings as defined in 28 U.S.C. § 157(b)(2)(A), (B), (K), (L) and (O).

## II.

### FACTUAL BACKGROUND

The debtor was organized on March 5, 1982, as a limited partnership under the laws of the State of Texas for the purpose of constructing, owning, and operating a Holiday Inn in Arlington, Texas, under a franchise with Holiday Inns, Inc., to be known as the "Holiday Inn—Great Southwest". In order to obtain a portion of the construction funds, the debtor executed a promissory note payable to UNUM on March 25, 1982, in the original principal sum of $7,500,000.00, payable over a thirty year term. The note bears interest on the unpaid principal balance at a coupon interest rate of 15¼% per annum, plus additional interest charged at the rate of 17½% per annum on the annual gross room rents in excess of $2,500,000.00, referred to hereinafter as gross income interest. The note prohibits voluntary prepayment during the first ten years of its term, and thereafter provides for a prepayment penalty on a declining scale as the note reaches maturity from 5% to a low of 1% of the amount prepaid. During the first ten loan years, however, the note does provide for an involuntary prepayment penalty in the sum of 10%. In addition, the note contains a provision permitting default interest to be charged at the highest rate permitted by Texas law, triggered in the event of default in payment of any installment when due. The note is secured by a deed of trust and security agreement which encumbers the Holiday Inn property, the major asset of the debtor.

The property is further encumbered by a second deed of trust executed by the debtor in favor of InterFirst securing a promissory note, dated August 16, 1983, in the original principal sum of $3,500,000.00. The current principal balance of this note, in the approximate sum of $3,000,000.00, will fully mature on August 16, 1988. Accrued interest on this note is due and payable on a monthly basis in the approximate sum of $20,000.00 per month.

In its schedules filed in this case, the debtor valued its real property in the sum of $14,897,620.66. At the confirmation hearing, however, the expert real estate appraiser employed by the debtor valued the property, utilizing the income approach, at the sum of $12,400,000.00. The total debt which is secured by this property, as reflected in the debtor's schedules, is $11,-132,059.83. As such, considering the appraisal testimony, the debtor enjoys an equity position in the property, at least effective the date of the filing of this bankruptcy case.

As a result of cash losses which commenced in 1985, coupled with an inability to provide debt service in 1986, the debtor filed its voluntary Chapter 11 bankruptcy petition on October 27, 1986.

Thereafter, in addition to filing its objection to confirmation and motion to dismiss, noted hereinabove, UNUM filed a motion for determination of secured status, seeking a decision from this Court, pursuant to 11 U.S.C. § 506(b), that the aforementioned coupon interest, the gross income interest, the default interest incurred after the filing of the bankruptcy petition, the prepayment penalty, as well as, reasonable attorney's fees and expenses are includible in its secured claim. In addition, UNUM filed a motion to require the deposit of administrative expenses, which requests that all accrued and unpaid post-petition interest be considered as an administrative expense, payable immediately prior to the entry of any order confirming the debtor's proposed plan of reorganization.

At the time of the confirmation hearing, it was agreed that the debtor was not insolvent, as that term is defined in 11 U.S.C. § 101(31).

Hereinafter all references to United States Code sections shall be considered as Title 11, United States Code, unless specifically noted otherwise.

### III.

### PREPAYMENT PENALTY

The initial plan of reorganization filed by the debtor excluded any treatment of the prepayment penalty found in the promissory note executed in favor of UNUM. At the conclusion of the confirmation hearing, the Court advised the parties that since the debtor was solvent and owned a significant, unencumbered equity position in the Holiday Inn property, that the prepayment penalty, even if not includible in UNUM's secured claim, must be treated in the debtor's plan of reorganization because of the interaction of § 1129(a)(7), the "best interest of creditors" test, and § 726(a)(4), the priority of distribution for penalties established for Chapter 7 liquidation cases. The Court was of the opinion that the prepayment penalty was not unmatured interest as contemplated in § 502(b)(2), inasmuch as the prepayment penalty was activated and *matured* once the plan of reorganization proposed to prepay UNUM's debt. Be-

cause of the debtor's solvency and particularly the debtor's positive equity position in the hotel property, UNUM would be entitled to distribution in a Chapter 7 liquidation case of its matured prepayment penalty claim. Since the original plan provided for no treatment of the prepayment penalty, it could not survive the test of § 1129(a)(7), which mandates that each holder of a claim or interest receive as much as would be received if the debtor were liquidated in a Chapter 7 case. Although the prepayment penalty may well have been an allowed secured claim under § 506(b), the resolution of this issue was not necessary because the plan was simply not confirmable as initially presented.

As mentioned hereinabove, subsequent to the confirmation hearing, the debtor filed its modified plan of reorganization. In a departure from the original plan where no treatment was afforded the prepayment penalty, the debtor's modified plan separately classifies the prepayment penalty and treats it as follows:

Class 6.5—The Penalty Claim of Union Mutual shall be paid in full according to the provisions of Paragraph 5 of the March 25, 1982 note from Debtor to Union Mutual. Upon prepayment of the Allowed Secured Claim of Union Mutual prior to March 25, 1992, a premium will be paid in an amount equal to ten percent (10%) of the principal sum prepaid; upon prepayment of the indebtedness to Union Mutual on or after March 25, 1992, or upon payment on maturity of such indebtedness under the provisions of Section 3.2 above, a premium will be paid in an amount equal to five percent (5%) of the principal sum prepaid. Union Mutual will retain its liens securing payment of its penalty claim. A Promissory Note and Deed of Trust incorporating these terms and the terms provided in Section 3.2 above, shall be delivered to Union Mutual on the Effective Date of the Plan.

The only distinction that the Court can discern between the above quoted provision in the debtor's modified plan of reorganization and the terms of UNUM's prom-

issory note is the fact that the debtor can voluntarily prepay the indebtedness prior to March 25, 1992, provided the 10% prepayment penalty is paid. The UNUM promissory note provides that there can be no voluntary prepayment prior to March 25, 1992, only an involuntary prepayment. In view of the fact that the debtor proposes to allow UNUM to retain its lien securing the prepayment penalty, this Court is of the opinion that the treatment of the prepayment penalty is permissible and will not preclude confirmation, if the debtor can satisfy the other provisions of § 1129(a) and (b). UNUM will receive on account of this penalty claim, property of a value, as of the effective date of the plan of reorganization, that is not less than the amount that UNUM would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

## IV.

### SHOULD THE ACCRUED AND UNPAID POST–PETITION INTEREST UNDER THE UNUM PROMISSORY NOTE BE CLASSIFIED AS AN ADMINISTRATIVE EXPENSE AND PAID IN FULL IN CASH ON THE EFFECTIVE DATE OF THE DEBTOR'S PLAN OF REORGANIZATION, PURSUANT TO THE AGREED ORDER AUTHORIZING THE USE OF CASH COLLATERAL

In its motion to require the deposit of administrative expenses, UNUM argues that the unpaid post-petition interest, accruing as a result of its promissory note, should be classified as a superpriority administrative expense and paid in full in cash on the effective date of the debtor's plan of reorganization. UNUM contends that the basis for this claim, is found in the provisions of the agreed order authorizing the use of cash collateral dated November 3, 1986. Pertinent terms are set forth hereinbelow:

5. GRANT OF PRIORITY ADMINISTRATIVE CLAIM: The debts and obligations of the Debtor to Union Mutual which result from this Order or continue to exist under this Order shall be, and they hereby are, granted priority in accordance with § 364(c) of the Bankruptcy Code over any and all administrative expenses of the Debtor, whether heretofor or hereafter incurred, of the kind specified in § 503(b) or § 507(b) of the Bankruptcy Code. [emphasis in original]

The following sentence is excerpted from paragraph 2 of the agreed order:

The use of Cash Collateral by the Debtor pursuant to the terms of this Order are hereby deemed to be post-petition advances pursuant to § 364(c) of the Bankruptcy Code.

The agreed order permitted the debtor to utilize the revenues generated from hotel operations to continue in business. In almost every respect, excepting the paragraphs quoted hereinabove, the agreed order is classic authority to utilize cash collateral by consent. Post-petition liens were granted to UNUM to secure the use of the cash collateral, and $331,440.00 was designated as a per month ceiling restriction on the extent of such use. Perhaps most significantly, in an effort to avoid the depletion of UNUM's cash collateral position existing prior to the entry of the agreed order, was the restriction that the debtor could not utilize more monies than were deposited by the debtor on a monthly basis into the operating account without the express written consent of UNUM. Therefore, the cash collateral position of UNUM would not be adversely impaired during the effective period of the order.

In calculating its purported administrative expense claim, UNUM advances the position that this claim should include all accrued post-petition coupon and gross income interest less post-petition payments made by the debtor. UNUM initially contended that this figure amounted to the sum of $354,369.49, effective April 1, 1987 ($579,451.49, accrued post-petition coupon and gross profits interest, less $225,082.00, post-petition payments made by the debtor). This amount was disputed through an affidavit prepared by Randal J. Wright, Controller of Jackson-Shaw Company, to the effect that the debtor had overpaid UNUM gross profits interest in the sum of

$13,422.18, as opposed to UNUM's assessment of $155,000.00. Following a review of the affidavit, UNUM agreed that the debtor's calculations were correct.

Regardless of the amount, however, this Court is of the opinion that the position taken by UNUM in regard to the shortfall in post-petition interest is untenable.

■ The granting of a superpriority administrative expense claim pursuant to § 364(c) is generally permitted when a lender advances new money in the form of a post-petition loan to the debtor. The use of cash collateral generated from the debtor's business operations cannot and should not be equated with new monies provided by a post-petition lender, regardless of the language appearing in the agreed cash collateral order.

As noted in the letter memoranda submitted by counsel for InterFirst, an agreed order is in the nature of a contract and is subject to the rules of construction of contracts. Counsel for InterFirst points out three rules of contract construction which are relevant to this issue, to-wit:

A. In construing a contract, the Court should determine and give effect to the intent of the parties. *Chadwick v. Esperanza Trade and Transport, Ltd.*, 548 F.2d 1161 (5th Cir.1977).

B. Each provision of a contract should be given its reasonable, natural and probable meaning when considered in relation to the agreement as a whole. *Hennigan v. Chargers Football Company*, 431 F.2d 308 (5th Cir.1970).

C. If a contract is found to be ambiguous (open to two reasonable interpretations), then the agreement will be construed more strictly against the party who drafted it. *Zapata Marine Service v. O/Y Finnlines, Ltd.*, 571 F.2d 208 (5th Cir. 1978).

The agreed order drafted by UNUM's counsel is ambiguous, perhaps by design, and must be more strongly construed against UNUM.

The continuing use of hotel revenues should not be construed as post-petition advances of credit in the same context as if new monies were being poured into the debtor by UNUM. UNUM's position in the cash collateral was being adequately protected through the extension of post-petition liens, as well as, by the requirement that sufficient revenues be deposited into the operating account to offset the amounts of money expended.

The method by which UNUM calculates its administrative expense claim leaves a great deal to be desired and, in fact, has almost nothing to do with the terms of the agreed order. The nonpayment of interest accrued post-petition has no connection to the use of hotel revenues for the continued operation of the debtor's business, i.e., the use of cash collateral. As appropriately noted in the InterFirst memorandum, the obligation that UNUM now attempts to claim as an administrative expense results from its original promissory note, rather than from the cash collateral order. Succinctly stated, the terms of the cash collateral order cannot be reconciled with UNUM's calculation of the proposed administrative expense claim.

For further explanation as to why UNUM should not be entitled to an administrative expense claim, one must look to the three Bankruptcy Code sections set forth in paragraph 5 of the cash collateral order. The first is § 364(c)(1), which provides as follows:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

§ 503(b) deals with the allowance of administrative expense claims which are defined and set forth in detail in subparts (1) through (6) of the subsection.

§ 507(b) provides as follows:

(b) If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a hold-

er of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

If the provisions of § 364(c)(1) were realistically applicable to this case, a debt incurred as a result of a post-petition loan transaction, *legitimately authorized,* might well enjoy superpriority status over other administrative expense claims allowed under § 503(b) or § 507(b). As set forth hereinabove, the Court is of the opinion that no credit was ever extended as a result of the agreed cash collateral order of a nature to even activate § 364(c)(1).

Because UNUM is an oversecured creditor whose position has been further protected through the extension of post-petition liens, and because there has been no diminution of this protection, UNUM has no claim allowable under §§ 503(b) or 507(a)(1) arising from the use of the cash collateral, which is absolutely necessary to activate the provisions of § 507(b).

The superpriority status afforded by § 364(c)(1) and § 507(b) are similar in that both can prime other administrative claims should there be a failure in other types of protection. As noted in *In re Callister,* 15 B.R. 521 (Bankr.Ut.1981), *appeal dismissed,* 673 F.2d 305 (10th Cir.1982), *aff'd* 13 BCD 21 (10th Cir.1984), "whereas adequate protection shields the creditor in the first instance from impairment in the value of his 'interest in property,' the superpriority [of § 507(b) ] was intended to recapture value unexpectedly lost during the course of the case ..." *Id.* at 528.

In the context of this case, the superpriority protection afforded by § 507(b) could well be activated, as a result of the cash collateral order, if the value of the collateral securing the UNUM indebtedness depreciated to the point that UNUM became an undersecured creditor.

UNUM's attempted use of § 364(c)(1) in an effort to shore up the agreed cash collateral order is simply improper and cannot be permitted. Judge Blackwell Shelley wrote the following in *In re AMT Investment Corporation,* 53 B.R. 274 (Bankr.E. D.Va.1985), a case factually similar to the case before this Court, to-wit:

Indeed, if § 364(c)(1) were intended as a means of providing adequate protection to a cash collateral creditor, there would be no need for § 507(b), which, again, was designed for such creditors, since it provides for a lower priority in distribution than does § 364(c)(1). By virtue of mutual consent with the debtor, a cash collateral creditor, or any secured creditor, could obtain a § 364(c)(1) priority and improve its position in distribution by virtue of the debtor's allegation it could not obtain alternative financing. That is precisely the situation in the case at bar, and it cannot be condoned.

*Id.* at 277.

For the reasons set forth hereinabove, UNUM's motion seeking to claim the unpaid post-petition interest as an administrative expense is not well taken and shall be denied.

## V.

## MODIFICATION OF INTERFIRST CLAIM

The modified plan, filed by the debtor subsequent to the confirmation hearing, provides for a change in the interest rate to be applied to the InterFirst claim from a fixed rate of 9% per annum to a variable rate of 1.5% per annum above the base interest rate charged by InterFirst, such rate to be adjusted on the same date as any change in the base interest rate. *See,* § 3.3, Debtor's Modified Plan of Reorganization. In addition, the modified plan provides for the execution of guaranties by Lewis W. Shaw, II, Kenneth Shaw, and Steven D. Jorns, who presently serve as guarantors on the existing promissory note payable to InterFirst. The individuals will

now extend their guaranties to the promissory note to be delivered to InterFirst on the effective date of the plan. These modifications, as they affect the claim of InterFirst, were accepted by InterFirst at the confirmation hearing, after such modifications were dictated into the record by counsel for InterFirst. Therefore, this Court is of the opinion that there is no need for further solicitation of InterFirst for acceptance of the modified plan.

## VI.

### MODIFIED TREATMENT OF ALLOWED INTERESTS HOLDERS

"Allowed Interests" is defined as the limited partnership interests of GSWHI Joint Venture and Lewis W. Shaw, II, and the general partnership interest of Brown 360, Ltd., a Texas limited partnership, in the debtor, as provided in the Second Amended and Restated Agreement of Limited Partnership of 360 Inns, Ltd., dated August 16, 1983. The modified plan provides in § 3.7, Class 7, that "[t]he Allowed Interests shall remain in full force and effect in accordance with their terms and the legal, equitable and contractual rights to which such Allowed Interests are entitled shall remain unaltered, except to the extent provided under Section 5.5 ..." Under the modified plan, the Allowed Interests are considered impaired.

§ 5.5 of the modified plan provides that: [t]he Debtor shall make no distributions of cash or cash equivalent to any general or limited partner or other person or entity except for operating expenses incurred in the normal course of business until: (1) the Promissory Notes to be delivered to Union Mutual and InterFirst under the Plan shall have been paid in full; or (2) there shall have been established a cash reserve of $200,000.00 as a reserve to insure the payment of the Promissory Notes payable to Union Mutual and InterFirst.

Insofar as impairment is concerned, the modified plan alters the Allowed Interests holders' claims only to the extent as provided in § 5.5, quoted hereinabove. These modifications, as they affect the Allowed Interests holders' claims were also dictated into the record at the confirmation hearing. Members of the Allowed Interests class, being Class 7, holding at least ⅔rds in amount of the allowed interests in such class, and constituting a majority of the members within said class, were present at the confirmation hearing and accepted the aforesaid modifications.

The additional modifications required by the Court as a result of this Opinion will affect the debtor's ability to make the proposed distributions to the Allowed Interests class. As such, the Court finds that there is a need for the debtor to solicit acceptances of the debtor's plan from the Class 7 Allowed Interests holders.

## VII.

### ACCEPTANCE OF MODIFIED PLAN BY OTHER CREDITOR CLASSES, AS WELL AS, CONTINUED REJECTION OF MODIFIED PLAN BY UNUM

No creditor classes or interests, other than the claims of UNUM, InterFirst, and the Allowed Interests holders are affected by the debtor's modified plan. As such, this Court is of the opinion that there is no need to solicit the acceptance of the modified plan from any other classes set forth in the modified plan except the Allowed Interests holders as discussed earlier.

UNUM, whose claims in the debtor's modified plan are treated in § 3.2 and § 3.65, previously rejected the debtor's original plan of reorganization. UNUM maintained its rejection of the modified plan at the confirmation hearing after the debtor changed the interest rate to be applied to the UNUM claim and added the provision for a cash reserve to secure the payment of the UNUM note to be delivered under the plan. Because of its previous rejection, as well as its current rejection of the modified plan, this Court is of the opinion that there is no need for the debtor to solicit UNUM's acceptance of the modified plan and that UNUM, pursuant to Rule 3019, Rules of Bankruptcy Procedure, is

deemed to have rejected the modified plan both as to its treatment under §§ 3.2 and 3.65 of the modified plan.

Therefore, the Court finds that all classes and all creditors have accepted the debtor's modified plan of reorganization except the Allowed Interests holders and UNUM, whose claims are treated as noted hereinabove in §§ 3.2 and 3.65 of the modified plan. If the debtor's modified plan is to be confirmed over the UNUM rejection, it must pass several tests set forth in the Bankruptcy Code, particularly the requirements found in 11 U.S.C. § 1129(b)(2)(A)(i)-(ii) or (iii).

## VIII.

### DEFAULT RATE OF INTEREST

Contained in the promissory note, executed by the debtor in favor of UNUM, is the following provision:

4. If any payment of principal or interest provided for herein is not paid when due, each and every such delinquent payment, including the entire principal balance and accrued interest in the event of an acceleration of this Note as provided below, shall bear interest at the highest rate permitted by law from its due date until date of payment.

Since the promissory note is in default, UNUM contends that it is entitled to default interest at the highest rate according to the laws of the State of Texas from the date of default through confirmation of the debtor's plan of reorganization. This rate is approximately 18% per annum. UNUM has elected not to accelerate the entire principal amount of the promissory note, but seeks to apply the default rate of interest, as a part of its allowed secured claim, against each unpaid monthly installment. UNUM calculates this interest by treating each unpaid monthly installment as a new loan. Since there has been no acceleration of the note balance, the net effect of UNUM's treatment is to charge interest on each unpaid installment at the default rate of 18% per annum. The source of this calculation is a letter memorandum submitted by UNUM's counsel subsequent to the confirmation hearing at the request of the Court.

Since UNUM is obviously an oversecured creditor, it argues that default interest should be a part of its allowed secured claim pursuant to § 506(b) which provides as follows:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The debtor, in opposing UNUM's claim for default interest, relies primarily on three cases, i.e., *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *In re W.S. Sheppley and Company*, 62 B.R. 271 (Bankr.N.D.Iowa 1986); and *In re Tampa Chain Co., Inc.*, 53 B.R. 772 (Bankr.S.D.N.Y.1985).

In *Vanston*, the issue was whether interest on unpaid interest should be paid to first mortgage bondholders where the bond indenture provided for such payment and where the debtor's assets were sufficient to pay the first mortgage bondholders in full, including the interest on interest. In *Vanston*, however, the debtor, unlike 360 Inns, Ltd., was insolvent. The Supreme Court recognized that if interest on interest were paid to the first mortgage bondholders that the distribution to lower priority creditors, including unsecured creditors, would be measurably reduced. The Supreme Court disallowed the payment of interest on interest, stating that bankruptcy courts as courts of equity should not always enforce default rates of interest, but the question should be approached on a case by case basis.

In the case before this Court, there are four factors which are critical to the resolution of this issue:

1. The debtor is solvent.

2. UNUM, the objecting creditor, is oversecured, enjoying a substantial equity cushion in the debtor's property.

3. InterFirst, the second mortgagee, like UNUM is oversecured and is to be paid in full. As a subordinate secured creditor, InterFirst has accepted the debtor's plan.

4. The debtor proposes to make substantial distributions to the Allowed Interests holders, the debtor's ownership class.

In *Vanston*, the debtor's insolvency was a critical issue in the Court's analysis, as was the concern for a fair and equitable distribution to all creditors.

*Sheppley*, like *Vanston*, involved an insolvent debtor. The Court there applied the *Vanston* rationale in terms of balancing the equities of all creditors on a case by case basis. Judge James Yacos, sitting by designation, stated the following:

> In the absence of any square ruling to the contrary, I conclude that a bankruptcy court presented with a § 506(b) motion is not *required* in all cases to apply a contractual default rate of interest in determining the amount of an 'allowed secured claim' within the meaning of that section.
>
> . . . .
>
> While I recognize that the cases cited can be read in different ways as to what they may 'imply' as to the question squarely presented to this court, I do believe they all indicate that flexibility is possible in determining whether default rate of interest should be allowed in a particular reorganization proceeding.
>
> . . . .
>
> Reviewing the record in the present case I find the following pertinent factors pointing to the inappropriateness of allowing a default rate of interest on the Metropolitan's secured claim: (1) Metropolitan has never faced any realistic risk of non-payment of its debt either before or during these proceedings; (2) There is no evidence before the Court that the 9.27% basic contract rate was not a prevailing market rate of interest at the time of default and thereafter; (3) Justification for an increased rate to compensate for an assumed increased

> risk following default does not apply in this case, particularly since the plan proposal is for a relatively quick orderly liquidation as opposed to a long term 'internal operation' type of reorganization; (4) On the evidence presently before the court it does not appear likely that distribution under the plan will reach down to shareholder interests; and at confirmation of any plan, if it should appear that shareholders may benefit, the court in its confirming order can provide for recapture of the default rate of interest for Metropolitan if the *Ruskin* ruling is determined to be persuasive and to be followed in this Circuit.... [emphasis in original]

*Sheppley* at 278–79.

Therefore, the *Sheppley* case turned on the debtor's insolvency, as well as, the fact that subordinate creditors would be penalized through the allowance of default interest. Perhaps more significantly, however, is Judge Yacos' parting shot to the effect that default interest could be recaptured at confirmation if the shareholders were to benefit. This decision clearly indicates that default interest can be permissible under certain circumstances.

In *Ruskin v. Griffiths*, 269 F.2d 827 (2nd Cir.1959), *cert. denied*, 361 U.S. 947, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960), the Second Circuit allowed a default rate of interest to be charged where the debtor was solvent and the benefits of the lower non-default interest rate would flow to the shareholders of the debtor, rather than to its creditors. There the court stated:

> In Vanston the Supreme Court disallowed an indenture trustee's claim against an insolvent debtor for interest on interest payments provided for in the trust indenture. The interest on interest accrued because the district court, pursuant to its administration of an equity receivership, had ordered both the debtor and the receiver not to pay simple interest coupons that fell due under the indenture after the court assumed jurisdiction. Even if we agreed with the court below that a Supreme Court precedent dealing with an obligation for interest on interest

falling due because of an equity court's stay order is equally applicable to a claim based upon a contractual provision for additional simple interest arising because the debtor sought the intervention of the bankruptcy laws, a question we need not now decide, we would still have to distinguish *Vanston* on what we find was a basic ground of that decision. In Vanston the debtor was insolvent, and in our case it appears the debtor is solvent. In *Empire Trust Co. v. Equitable Office Bldg. Corp.*, 2 Cir., 1948, 167 F.2d 346, we avoided a resolution of the effect of Vanston upon parties to a reorganization proceeding involving a solvent corporation, but the issue is squarely before us now, and we hold that the Supreme Court did not intend that the principle enunciated by it in Vanston, in a contest between creditors, should be applied to a contest between a debtor's creditor and its stockholders.

*Id.* at 830.

The *Ruskin* Court, commenting on the Supreme Court's decision in *Vanston*, pointed out language in the *Vanston* opinion to the effect that where an estate was sufficient to pay all creditors and to pay interest even after the petition was filed, that equitable considerations should be invoked to permit payment of additional interest, i.e., default interest, to the secured creditor rather than to the benefit of the debtor.

The *Ruskin* Court then went on to say: "On the other hand, in *In re International Hydro-Electric System*, D.C.D. Mass. 1951, 101 F.Supp. 222, 224, the Massachusetts district court carefully considered this very problem when it held:

'[I]t is important that IHES is not at the present time insolvent. It has assets more than sufficient to meet all claims of its creditors. No benefit will be given to the debenture holders at the expense of any other class of creditors. The burden of this payment will fall entirely on the interest of the stockholders. They cannot complain that they are treated inequitably when their interest is cut down by the pay-

ment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture. The situation here differs from that in *Vanson Bondholders Protective Committee v. Green* * * * where the payment of interest on deferred interest payments was not allowed even though called for by the trust indenture, because the payment would have reduced the share of subordinate creditors in the reorganization of an insolvent corporation.'

A variable interest provision in event of a stated default such as we have here is not a penalty, nor should it be considered unconscionable."

*Ruskin* at 832.

There appears to be no dispute in this case that the charging of a default rate of interest is permissible in the State of Texas. A case dealing with a solvent debtor which permitted a default rate of interest to be charged is *Debentureholders Protective Committee of Continental Investment Corp. v. Continental Investment Corp.*, 679 F.2d 264 (1st Cir.), *cert. denied*, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982). There the court held as follows:

But with respect to post-petition interest on both the unpaid instalments which fell due before, and the unpaid instalments which fell due after, the petition, the legal situation is different when the supposed bankrupt proves to be *solvent*. Where the debtor is *solvent*, the bankruptcy rule is that where there is a *contractual* provision, valid under state law, providing for interest on unpaid instalments of interest, the bankruptcy court will enforce the contractual provision with respect to both instalments due before and instalments due after the petition was filed. *Ruskin v. Griffiths*, 269 F.2d 827, 830–32 (2nd Cir.1959), *cert. den.* 361 U.S. 947, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960); *In re Hydro-Electric System, supra*, [at] 224. This rule is fair and equitable inasmuch as the solvent debtor's estate will have been enriched by the bankruptcy trustee's use of money which the debtor had promised to pay promptly to the creditor, and, corre-

spondingly, the creditor will have been deprived of the opportunity to use the money to *his* advantage. Moreover, the rule does not in any way affect any creditor other than the claimant of interest on interest. Finally, the rule is in harmony with the settled English and American law that when an alleged bankrupt is proved solvent, the creditors are entitled to receive post-petition interest before any surplus reverts to the debtor. *New York v. Saper*, 336 U.S. 328, 330 n. 7, 69 S.Ct. 554, 555 n. 7, 93 L.Ed. 710 (1949); *United States v. Bass*, 271 F.2d 129, 130 (9th Cir.1959); *Littleton v. Kincaid*, 179 F.2d 848, 27 A.L.R.2d 572 (4th Cir.1950). [emphasis in original]

*Debentureholders Protective Committee* is cited with approval in *In re Manville Forest Products Corp.*, 60 B.R. 403, 404 (S.D.N.Y.1986), to the effect that interest on interest is chargeable to a solvent debtor.

■ Looking at the factors that are pertinent to this case as set forth hereinabove, i.e., a solvent debtor, an oversecured objecting creditor, and distributions being proposed for subordinate creditors and Allowed Interests holders, this Court is of the opinion that UNUM is entitled to be paid interest on the unpaid installments, which necessarily includes interest on interest. Consideration has been given by the Court to the fact that UNUM has not accelerated the full note balance, and merely seeks to charge interest on payments that it has not timely received. Although the Court has not seen the precise mechanical calculations proposed by UNUM, the fact that the installment payments are not being timely paid is perceived to be an actual pecuniary loss to UNUM. The Court, however, does not necessarily agree that a default rate of interest at the rate of 18% per annum is reasonable under the circumstances of this case. Although the Court will permit UNUM to charge interest on the unpaid installments, the rate at which this charge shall be permitted bears careful scrutiny.

In the *Sheppley* case, cited hereinabove, Judge Yacos, in discussing the applicability of a contract rate of interest, pointed out

the punctuation ambiguity that appears in § 506(b), as follows:

As both parties recognize, the language of § 506(b) can be read in two different ways. The statute provides:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The question is whether the comma after the reference to interest indicates that the interest allowance is *not* governed by the contract. See 3 *Collier on Bankruptcy*, 15th Ed., § 506.05, pp. 506–41, 42 (1985), regarding the alleged 'misplaced comma' and the resultant ambiguity.

There is very little legislative history on this provision but Judge Clark makes a convincing argument that the punctuation does not indicate a Congressional intent to render the contract rate irrelevant. See *In re Loveridge Machine & Tool Co.*, 36 B.R. 159 (Utah 1983).

. . . .

On balance, I conclude that § 506(b) should be construed to include reference to interest at the contract rate. This, however, does not settle the issue as to default rates since—as will be developed below—the Supreme Court has held that contractual and other legally-established rights may sometimes conflict with equitable principles of distribution under the bankruptcy laws. [emphasis in original]

*Sheppley*, at 273–74.

As pointed out earlier, because the debtor in *Sheppley* was insolvent, Judge Yacos prohibited the application of interest on interest at the default rate, regardless of the fact that the default rate was clearly specified in the contractual agreement. As noted in the above quotation from the *Sheppley* opinion, legally established rights may sometimes conflict with equitable principles of distribution in bankruptcy.

Although the debtor in this case, 360 Inns, Ltd., is currently solvent, this Court is convinced that had the debtor continued its course of operations without filing this bankruptcy case, insolvency was inevitable. Because of the economic conditions existing in the Arlington, Texas area, including the increased competitiveness in the hotel market, as well as, the substantial interest being paid by the debtor to UNUM, the debtor's balance sheet would have reflected a negative net worth within a fairly short period of time.

Although it dealt primarily with a dispute concerning the interest rate to be applied in calculating damages, necessary to compensate secured creditors pursuant to § 1124(2)(C), *Matter of Arlington Village Partners, Ltd.*, 66 B.R. 308 (Bankr.S.D.Oh. 1986) differentiated between a non-default interest rate and a default interest rate appearing in a single contract. Concluding a well reasoned analysis, Judge Waldron held as follows:

> In order, therefore, to compensate the creditors of this long-term debt for damages incurred by reasonably relying on the contract's default terms, and to provide appropriate interest on their claims, the court follows the principle developed in *In re Colegrove* [771 F.2d 119 (6th Cir.1985)] that equity demands that the present value of those delayed payments be recognized through the imposition of a market rate of interest. The court notes, however, that in the instant case, the parties bargained at arms-length and recognized fluctuating market rates on long-term debts by reflecting varying interest rates in their contract over its term, and further, that they mutually agreed in connection with this proceeding that, at a minimum, interest is ten percent (10%) per year on the total arrearages for payments of principal and interest owed for February-December 1985 and eleven percent (11%) per year for the January 1986 default.
>
> Accordingly, the court orders that interest be computed using the market rate for long-term mortgages as of the due date of each late payment until the date paid, providing, however, if the mar-

ket rate is below the ten percent (10%) or eleven percent (11%) stipulated minimum interest rate for the period in question, that interest be computed at the applicable ten percent (10%) or eleven percent (11%) agreed to by the parties in their contract, and if the market rate is higher than the default rate of fourteen percent (14%) agreed to by the parties in their contract, that the fourteen percent (14%) rate be used for computation.

*Id.* at 319.

Succinctly stated, the bottom line in *Arlington Village Partners, Ltd.*, is that if the market interest rate is lower than the contract rate, then the court should apply interest at the contract rate. On the other hand, if the market interest rate is higher than the contract *default* rate, then interest should be applied at the contract *default* rate. In the case before this Court, it is obvious that the market interest rate is lower than the non-default contract interest rate, and most certainly lower than the default contract rate. As such, considering the equitable principles of distribution in bankruptcy, particularly the eventual, inevitable insolvency of the debtor herein, this Court is of the opinion that interest on the unpaid installments should not be charged by UNUM at a rate exceeding the non-default contract interest rate, i.e., 15¼% per annum. This conclusion is further supported by the fact that the market rate of interest at this time is not marginally but is significantly less than the non-default contract interest rate. To permit UNUM to charge a rate in excess of 15¼% per annum would be clearly unreasonable.

UNUM will therefore be permitted to charge interest on each unpaid installment, as if said installment were a new loan, from the date of default until the date of confirmation at the rate of 15¼% per annum.

## IX.

## THE APPROPRIATE DISCOUNT RATE REQUIRED BY 11 U.S.C. § 1129(b)

As noted hereinabove, UNUM has rejected the debtor's modified plan of reorganiza-

tion which proposes to fully pay UNUM's allowed secured claim in deferred cash installments bearing a discount rate of 1.5% per annum over the prime base rate of InterFirst. UNUM objects to the use of this proposed discount rate and insists that the default rate of interest, set forth in its existing promissory note, i.e., the highest rate permitted under the laws of the State of Texas or 18% per annum, should be used instead. The issue, therefore, is whether the debtor's modified plan of reorganization can be "crammed down" over the dissent of UNUM, pursuant to § 1129(b) which is set forth as follows:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens,

with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

The focal point of whether the debtor's modified plan meets the requirements of § 1129(b) centers on the appropriate discount or interest rate to be applied to UNUM's allowed secured claim. Because UNUM is an oversecured creditor, its allowed secured claim, which necessarily includes interest, attorney's fees, and costs, as discussed earlier in this Opinion, must be paid in full. Since the debtor proposes to pay this claim in deferred installments, a discount or interest factor must be added so that UNUM will receive no less than the full present value of its claim.

*In re Jones*, 32 B.R. 951 (Bankr.D.Ut. 1983), offers an informative overview of this frequently litigated issue, to-wit:

Few other issues under the bankruptcy code have produced so many opinions with such varied results as has the issue of the appropriate interest rate for determining present value. Chapter 11 cases include *In re Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983); *In re Bay Area Services*, 26 B.R. 811 (Bkrtcy.M.D.Fla.1982); *In re Moore*, 25 B.R. 131 (Bkrtcy.N.D.Tex.1982); *In re Tacoma Recycling, Inc.*, 23 B.R. 547 (Bkrtcy.W.D.Wash.1982); *In re Sullivan*, 26 B.R. 677 (Bkrtcy.W.D.N.Y.1982); *In re Patel*, 21 B.R. 101 (Bkrtcy.M.D.Fla. 1982); *In re Nite Lite Inns*, 17 B.R. 367 (Bkrtcy.S.D.Cal.1982); *In re Burgess Wholesale Manufacturing Opticians*, 16 B.R. 733 (Bkrtcy.N.D.Ill.1982); and *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653 (Bkrtcy.D.N.J.1980). There are more than fifty chapter 13 cases. Their relevance in the chapter 11 context, however, is an issue not yet resolved. Many factors may make the complexion of the risk in a chapter 13 case different from the risk in chapter 11. Nevertheless, the chapter 13 cases have broken important analytical ground. Most of the chapter

13 cases can be found in the citations in *In re Fisher*, 29 B.R. 542 (Bkrtcy.D.Kan. 1983) and *In re Evans*, 20 B.R. 175 (Bkrtcy.E.D.Pa.1982).

*Id.* at 958 n. 12.

A case cited by the debtor, *In re Monnier Bros.*, 755 F.2d 1336 (8th Cir.1985) offers threshold insight concerning the selection of an appropriate discount rate, to-wit:

> Under § 1129(b)(2)(A)(i)(II), deferred cash payments due Prudential must total 'a value, as of the effective date of the plan, of at least the value of [Prudential's] interest in the estate's interest in' the collateral. Since the Prudential loan was accelerated and oversecured, Prudential had a right at the date the plan became effective to the unpaid principal plus any contract rate interest that had accrued up until that time. The task of the bankruptcy court was to determine what rate of interest would insure [that] Prudential ultimately receive the full value of that amount, given that the plan provided for level amortized payments over a fifteen year period.

> One of the Code's few clues about what factors to take into account in selecting an appropriate interest rate appears in § 1129(b)(2)(A)(iii); that section states that a plan may be confirmed over the objections of a secured creditor if the plan affords the creditor the 'indubitable equivalent' of his claim. 11 U.S.C. § 1129(b)(2)(A)(iii).

> . . . .

> Although § 1129(b)(2)(A)(iii), with its 'indubitable equivalent' standard, is stated as an alternative to deferred repayment of the secured debt under § 1129(b) (2)(A)(i)(II), we are satisfied from a reading of [In re] *Murel* [Holding Co., 75 F.2d 941 (2d Cir.1935)] that the congressional reference to the case expresses threshold requirements applicable to selection of an appropriate interest rate. *Cf. In re American Mariner Industries*, 734 F.2d [426] at 432 [9th Cir.1984] ('indubitable equivalent' provision of 11 U.S.C. § 361 is a 'catch-all alternative').

> In the present case, neither Prudential nor debtors provided the bankruptcy court with much assistance in determining what interest rate would compensate Prudential for the time value of its money and the risks to its principal. Prudential provided no evidence on the issue, other than the rate set by the contract. Debtors, relying on 5 *Collier on Bankruptcy* ¶ 1129.03, at 1129–63 n. 45, provided the bankruptcy court with the prime rate, federal fund rate, discount rate, call money rate, commercial paper rate, certificates of deposit rate, and treasury bill rate, that had been reported in the December 9, 1983 *Wall Street Journal*.

> The debtors ignored, however, a subsequent passage from the *Collier* discussion:

>> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.

> 5 *Collier on Bankruptcy* ¶ 1129, at 1129–65. We note that the treasury bill rate, which the bankruptcy court ultimately applied, reflected one rate of return available on a short term, low risk investment. *See In re Loveridge Machine & Tool Co.*, 36 B.R. 159 (Bankr.D. Utah 1983). [emphasis added]

*Id.* at 1338–39.

■ Although the term "indubitable equivalent" is perhaps even more vague than "an appropriate discount rate", the quotation from 5 *Collier on Bankruptcy* ¶ 1129, which mentions that the discount rate should be determined on the basis of a reasonable rate of interest considering the risks involved, is not only meaningful, but provides direction for this Court. Therefore, an appropriate discount rate should be calculated on a case by case basis, considering such factors as the prevailing market rate for a loan of equal term to that proposed in the debtor's plan, the quality of

the collateral securing the indebtedness, the credit standing of the borrower, and the risk of subsequent default.

*In re Loveridge Machine and Tool Co., Inc.*, 36 B.R. 159 (Bankr.D.Utah 1983), another well written opinion by Judge Glen Clark, literally "covers the waterfront" on the issue of determining an appropriate discount rate. There, the dispute between the parties concerned the interest rate found in 28 U.S.C. § 1961(a), which was urged by the debtors since at that time it was substantially less than the contract rate of interest, as opposed to the contract rate which was urged by the secured creditor. The opinion perceptively noted that factors to be considered in setting an appropriate discount rate in a Chapter 11 context might well be distinguished from those factors utilized in setting a discount rate in a Chapter 13 case. Although Judge Clark did not set a firm discount rate, he disapproved the rate proposed by the debtors (that promulgated under 28 U.S.C. § 1961(a)), stating the following:

I find, based upon the above analysis, that none of the opinions which have adopted 28 U.S.C. § 1961(a) as a proper source of a discount rate for deferred cash payments is good precedent for making a decision in this case.

Independent of this conclusion, however, is my opinion that to use 28 U.S.C. § 1961(a) as the source of the interest rate for discounting deferred cash payments to Northwest under this plan would be ill advised and erroneous as a matter of law. Although Section 1961(a) is a convenient source for interest rates and is helpful in determining the risk-free rate of interest for one year loans, this case does not involve a risk-free loan. Neither does it involve a one year loan. Government obligations to repay loans evidenced by Treasury bills are, according to the prevailing economic wisdom, among the least risky of all investments. It is to be questioned whether the short-term risk-free rate of interest is a rational, much less a 'fair and equitable' rate of interest for debtors' promise to pay Northwest's debt under its plan of reorganization. It has been said that '[n]o index for short term loans ... is a sound baseline for arriving at a fixed rate that is to govern a forced loan for a period of years.' Blum, *supra* at 442. Northwest's loan will not be repaid for six to seven years. Debtors' credit standing, even if their plan is confirmed, will not in any sense be as good as those who may borrow at a risk-free rate. The parties, at the inception of Northwest's loan, calculated that a 19 percent interest rate would best measure the risks of the transaction. A rate of nearly half that rate seems inappropriate now. *If debtor had shown that under its plan the risk of non-payment of Northwest's debt is about the same as the risk of non-payment of 52–week Treasury Bills, the court might have been persuaded otherwise. No such evidence was offered.* Thus, although 28 U.S.C. § 1961(a) might be a good source for an interest rate in another case, it is not an acceptable source in this case. Moreover, the propriety of using 28 U.S.C. § 1961(a) as the source of the interest rate in this case is questionable in light of current rates of interest on similar loans. An officer of Northwest testified without contradiction that a loan similar to the one proposed by this plan, similarly collateralized, and with similar terms, would require a 14 to 16 percent interest rate if made to a borrower with good credit. A loan to a borrower with debtors' post-confirmation credit would require an interest rate of approximately 20 percent.

Section 1129(b)(2)(A)(i)(II) contemplates a 'present value analysis that will discount value to be received in the future.' H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 412, 414–415 (1977), U.S.Code Cong. & Admin.News 1978, p. 6370; 124 Cong.Rec. H. 1104 (Sept. 28, 1978); S. 17421 (Oct. 6, 1978). This present value analysis was intended to 'recogniz[e] the time-value of money.' House report, *supra* at 413, U.S.Code Cong. & Admin. News 1978, p. 6369. *A method for determining the time value of money is not given.*

In *In re Stockdale Corporation,* Bankr. No. 81–01288, transcript of oral ruling, Mabey, J. (Bkrtcy.D.Utah June 23, 1982), the court found that the concept of the time value of money under Section 1129(b) with respect to a class of dissenting secured claims could be approached by beginning with the interest rate on risk-free investments due at the time of the completion of payments under the plan. To the applicable risk-free rate of interest, the *Stockdale* approach adds extra interest where necessary to compensate for risks imposed on secured creditors under the plan. Since secured creditors face some unavoidable risks even in the event of a liquidation, the additional interest to be added to the risk-free rate is based only on the additional risks imposed by the plan. [emphasis added]

*Id.* at 169–70.

Consistent with the *Loveridge* opinion, the majority of cases follow the proposition that the discount rate should be comparable to the rate of interest which would be charged by a creditor making a loan to a borrower with similar terms, circumstances, duration, collateral and risks. *See, In re Wolf,* 61 B.R. 1010 (Bankr.N.D.Ia.1986), *In re Hildreth,* 43 B.R. 721 (Bankr.D.Id. 1984), and *Matter of Landmark at Plaza Park, Ltd.,* 7 B.R. 653 (Bankr.D.N.J.1980).

In order to determine whether the debtor's proposed discount rate is appropriate, considering the factors cited in the aforementioned cases, the Court must consider the testimony and evidence offered at the confirmation hearing. At the hearing, the debtor presented expert testimony through Ronald Colter, Senior Vice President, Miller/Dale—Wallenstein, a real estate investment banking firm owned by the Grubb and Ellis Company. (See debtor's Exhibit 3 for the qualifications of the witness.) The crux of this testimony centered on the appropriate interest rate that would be charged in the market by a creditor making a loan to a borrower under similar circumstances as those existing in the instant case. The following dialogue is excerpted from page 54 of the confirmation hearing transcript, to-wit:

Q. All right. Mr. Colter, I want you to assume the following facts:

Assume that we have a hotel, a Holiday Inn franchise located in Arlington, Tarrant County, Texas.

Assume further that it's managed in a competent fashion; that it's well maintained.

Assume further that we're talking about a first lien indebtedness of approximately $8 million.

Assume further that the lender can be forced involuntarily to make such a loan, so you don't have to worry about whether or not you can get somebody to actually make this loan; just assume that fact.

Assume further that the hotel and the improvements are worth approximately $12.4 million.

Assume further that the note on this first lien debt would be a note with a five-year term based upon a thirty-year amortization schedule; that they balloon at the end of five years.

And, I'm going to ask you in your opinion, would a 1½ percent floating rate of interest over the prime rate be a reasonable rate of interest for such a note, giving due consideration for the quality of the collateral and the risk of subsequent default?

A. Yes.

On re-direct examination by debtor's counsel, the following question and answer are excerpted from page 62 of the confirmation hearing transcript, to-wit:

Q. Mr. Colter, having heard all the risks and factors outlined by Mr. Pronske, would it change your opinion that 1½ over prime was a reasonable rate, assuming that you can have an involuntary loan?

A. That would be a reasonable rate.

To rebut this testimony, UNUM called its Regional Manager, Investment Real Estate Division, Peter F. Curtis, who testified that in setting interest rates, lenders generally start with existing rates set for treasury notes, bills, and bonds, and to those rates, different layers of risk factors are added, calculated as interest percentage points.

(See pages 68 and 69 of the confirmation hearing transcript.) Unfortunately, Mr. Curtis did not provide a firm interest rate that would be charged by UNUM to a borrower under circumstances similar to those existing in this case. He did testify, however, that he disagreed with the debtor's proposed rate, evidenced by the following excerpted testimony from pages 95 and 96 of the confirmation hearing transcript:

Q. Is prime plus 1½ a fair rate of interest given similar terms, duration, collateral, and risks in this situation?

A. Specifically to this particular property?

Q. Yes.

A. No, not even close.

Q. Is this in the ballpark?

A. Not even light years.

In support of Mr. Colter's testimony, the debtor offered into evidence the following exhibits:

A. Debtor's Exhibit No. 1—Miller/Dale—Wallenstein Market Update Report, week of 2/9/87, reflecting interest rates, fees, and terms quoted by various nationwide lenders.

B. Debtor's Exhibit No. 6—*The Wall Street Journal*, Money Rates, effective February 13, 1987, reflecting among several rates listed, a prime rate of 7½% per annum, the base rate on corporate loans at large U.S. money center commercial banks. (The Court notes that at this writing, the same publication indicates that the prime rate has risen to 8¼% per annum.)

C. Debtor's Exhibit No. 12—*The Wall Street Journal*, Treasury Bonds, Notes and Bills Rates, effective February 13, 1987, reflecting various maturity dates and corresponding yields applicable to the aforementioned U.S. Government securities.

As a result of UNUM's objection, the Court is called upon to decide three issues:

(1) Whether the debtor's plan was filed in good faith as required by § 1129(a)(3);

(2) Whether the discount rate proposed by the debtor meets the "best interest of creditors test", found in § 1129(a)(7); and

(3) Whether this discount rate is "fair and equitable", as required by § 1129(b)(2)(A).

In an effort to show that the debtor's plan was not filed in good faith and, presumably, that the plan did not meet the requirements of § 1129(a)(7), UNUM introduced into evidence its Exhibit No. 9, which was an analysis prepared by its Regional Manager, Peter Curtis, of the projections found in the Cushman—Wakefield Appraisal Division Report, said report having been introduced into evidence as Debtor's Exhibit No. 2. This analysis, i.e., UNUM Exhibit No. 9, reflected the net income available for debt service which was extracted directly from the Cushman—Wakefield projections, as well as, reflected excess funds available after debt service to UNUM and InterFirst. The Court is of the opinion that the excess funds analysis prepared by Mr. Curtis is totally inaccurate. First, it calculates the annual debt service at a *fixed* interest rate of 9% per annum, based on *principal* debt balances only. In other words, the analysis does not take into account that the debtor proposes to pay both UNUM and InterFirst on a floating rate, i.e., 1½% above the InterFirst prime rate, as well as, that interest, cost, and attorney's fees should be added to the principal balances prior to the application of any interest rate. Secondly, the analysis is inaccurate in that it does not consider the reduction of principal which is built into the debt amortization. Consequently, the Court has no reliable evidence to determine exactly what excess funds will be available, if any, to be applied to presumably the Allowed Interests holders' claims. As such, the Court is left only with the conclusion that the debtor's modified plan is proposed in good faith and not by any means forbidden by law.

The "best interest of creditors test" found in § 1129(a)(7), is set forth as follows:

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; ...

The debtor proposes to pay UNUM, admittedly an oversecured creditor, the full amount of its allowed secured claim, including principal, accrued interest, costs, and attorney's fees, plus a present value discount factor at the rate of 1½% above the InterFirst prime rate. If the discount factor is appropriate, UNUM will certainly receive as much as it would be entitled to receive if the debtor were liquidated in a Chapter 7 case. As Judge Leroy Smallenberger commented in *In re Hollanger,* 15 B.R. 35 (Bankr.W.D.La.1981), a case permitting the "cramdown" of dissenting oversecured creditors' claims, to-wit:

where a dissenting claimant is receiving payment in full over a reasonable period of time, with an appropriate interest or discount factor being paid, that creditor is receiving all that the law requires ...

*Id.* at 47.

In that case, the Court analyzed the plans' provisions in depth and concluded that the plans were "fair and equitable" as to the oversecured creditors, even though the unsecured creditors were to be paid in full prior to the oversecured creditors being paid in full, and even though the debtors were retaining an equity ownership in the secured property.

In this context, as additional protection for UNUM, the debtor's plan was modified to prohibit any distribution to the Allowed Interests holders until a cash reserve of $200,000.00 is established as a buffer to secure the payment of UNUM's claims, or until its claims are paid in full. Additionally, the debtor modified its plan to include the limited recourse provision against the debtor which is found in paragraph 12 of the UNUM promissory note. Accepting at this moment that the amount of the discount factor is reasonable, the modified plan appears to balance the rights of all creditors, while at the same time it represents an approach through which the debtor can feasibly reorganize.

Turning back now to the appropriate discount factor, the Court looks to the guidance provided in *In re Wolf,* 61 B.R. 1010 (Bankr.N.D.Ia.1986), where Judge Yacos, again sitting by designation, addressed the "fair and equitable" test as follows:

With regard to the fair and equitable test under § 1129(b)(1), (2) of the Code, the key issue is the setting of an appropriate interest rate on the payout to the secured creditors to assure that the deferred cash payments have a present value, as of the effective date of the plan, at least equal to the value of the creditors' interest in their collateral. The debtors offered expert witness testimony from a witness familiar with 'rates of return' in various types of financing transactions. He has testified before various regulatory commissions and agencies. He testified in this court to a methodology looking to the 'lost opportunity costs' in terms of what kind of return each creditor would receive by putting cash equal to the value of their lien into investments having comparable risks and a similar period of time.

The witness then compared the present debt obligation to medium grade bonds having a 'Baa' or 'BBB' rating. Under nationally recognized rating agency evaluations, the evidence indicates that under present circumstances the appropriate interest rate for such obligations would range from 10.5 percent to 11.2 percent. The witness also indicated the low end of that range would be most appropriate in terms of the present trend downward in such interest rates.

Against this evidence, the creditors offered testimony of bank officials stating that they would make no loans at 100 percent of value in the first place, and that in any event their going interest rates ranged from 12.75 percent to 13.25 percent. I believe the reference to the '100 percent loan' by the creditors is inappropriate in the present context of dealing with an *existing* loan. The rest

of the creditors' evidence, in effect insisting upon *its* current contract rates on other loans, is likewise off the mark. For one thing, there is no showing that the risks and terms of those other loans are in fact comparable to the present situation. Secondly, I do not believe that 'creditor specific' interest rates are mandated by the 'fair and equitable' concept embodied by § 1129(b)(1) and (2) of the Code. Otherwise a creditor who exacts exorbitant interest rates would automatically be guaranteed the same rates in Chapter 11 reorganization. The irony of such a result under a 'fair and equitable' standard is apparent.

On balance, I conclude that an interest rate of 11 percent is appropriate and will accord the objecting creditors fair and equitable treatment within the meaning and spirit of § 1129(b)(1) and (2) of the Bankruptcy Code. The Court of Appeals for the Eighth Circuit has indicated flexibility in devising appropriate standards for farmer reorganization cases and I believe that the novel expert testimony offered by the debtors in this case, on interest rates, is convincing and establishes an appropriate range of such rates for present purposes. See *In re Monnier Bros.*, 755 F.2d 1336, 1339, 1342 (8th Cir.1985); *In re Ahlers*, 794 F.2d 388 (8th Cir.1986). The debtor has agreed to amend the plan to include the interest rate determined to be appropriate by this court. [emphasis in original]

*Id.* at 1012–13.

Another case discussing appropriate discount rates and interest rates at length is *Matter of Fi-Hi Pizza, Inc.*, 40 B.R. 258 (Bankr.D.Ma.1984). That case, however, is somewhat different than the case now before this Court in that priority tax claims were the subject of the dispute. The Commonwealth of Massachusetts had objected to the debtor's Chapter 11 plan of reorganization on the ground that it did not require payment of interest at the rate of 18% per annum on its priority tax claims. Judge Harold Lavien held that the Commonwealth was entitled to interest at the prevailing Internal Revenue Code rate on delinquent taxes plus 2.5%, concluding that

this formula would provide an appropriate present value to the Commonwealth's claims which were to be paid in deferred payments of cash. The court relied on 26 U.S.C. § 6621 as a base rate, and then added the additional percentage points for the following reasons:

The Court notes that the § 6621 rate has been criticized in the past. *See, In re Southern States Motor Inns, Inc.*, 709 F.2d 647, 651–52 (11th Cir.1983); *In re Bay Services*, 26 B.R. 811 (Bkrtcy.M.D.Fla.1982); *In re Moore*, 25 B.R. 131 (Bkrtcy.N.D.Tex.1982); *In re Tacoma Recycling, Inc.*, 23 B.R. 547, 556 (Bkrtcy.W.D.Wash.1982). This criticism is based mainly upon a possible time lag of nearly two years in the effective date of interest changes. However, § 6621 was recently amended to provide for six-month adjustments, to bring the determination even closer to economic events and prevailing economic conditions. Pub.L. No. 97–248. Although it is still possible for a party to 'reap a windfall,' the fact that the rate imposed by the Court will change when the § 6621 rate changes during the course of the debtor's deferred payments, means that the inequities will balance themselves during the long run. Also, it should be noted that the prime rate of any particular date is minimized because the § 6621 rate is an averaging of six months of rate variances. [footnote omitted]

As the Court has note previously, the § 6621 rate approximates a current rate. Granted that there may be rates that are more reflective of the current market in the short-term, over the long-term—and that is what is involved in most periodic tax payments—the § 6621 rate, as periodically adjusted and averaged, does provide an approximation of an effective reflection of the market rate of interest and thus approaches present value. Moreover determination of the § 6621 rate by the Department of Treasury provides an accessible public figure that is not open to dispute so that chapter 11 debtors and, most important, potential investors can have relative certainty in

working toward reorganization. Accordingly, this Court will utilize though not confine itself to the § 6621 rate in determining the market rate.

The question remains as to what is the appropriate adjustment. The Court, in analyzing the previously described loan rates (home mortgage rates from 1.25% below § 6621 to 5.75% above, unsecured personal loans from 5 to 8% above), treasury notes and bonds (from 1.23% below and 1.99% above), and the SBA rate (1.75% above) as they relate to the present § 6621 rate, and having a special regard to its almost daily experience with the rates charged by actual commercial lenders and other financier's of chapter 11 debtors that range from one to three per cent over prime, [footnote omitted] finds that a rate that is 2.5% above the § 6621 rate as periodically adjusted to be appropriate. [footnote omitted] Such a combined rate will provide the Commonwealth taxing authorities, over the term of payments, a sum approximately equal to present value.

While there can be no absolute assurance that any stream of payments will, with certainty, place the recipient in the exact same position it would have been had a full cash payment initially been made, the Court must use its best judgment based upon all the factors presented to it to approximate as clearly as possible that result.

*Id.* at 271–72.

*Fi-Hi Pizza* is cited with approval in a case decided earlier in this district, *In re Neff,* 60 B.R. 448 (Bankr.N.D.Tx.1985), *aff'd,* 785 F.2d 1033 (5th Cir.1986).

As noted above, the debtor proposes to pay off the UNUM indebtedness at the end of five years, but the monthly payments over this five year period are calculated on the basis of a thirty year amortization with one final "balloon payment".

A review of the aforementioned documentary exhibits introduced by the debtor reveals the following information:

*Exhibit 1*—The interest rates for five year obligations ranged from 9.325% to 10.45% including discount points of 1.2%.

The interest rates on thirty year obligations ranged from 10.775% to 11.45% including discount points of 1.2%.

*Exhibit 6*—The Federal Home Loan Mortgage Corporation (Freddie Mac) interest rate on a thirty year mortgage was reflected at 8.89%. This type mortgage, however, would secure specifically a residential loan, rather than a commercial transaction. As of June 1, 1987, this rate has risen to 10.57%. The Federal National Mortgage Association (Fannie Mae) interest rate on a thirty year mortgage was reflected at 8.72%. This type mortgage, like the Freddie Mac, would secure only a residential loan. As of June 1, 1987, this rate has risen to 10.3%.

*Exhibit 12*—The treasury bond and treasury note yield for a twenty-nine year obligation, which is nearest to the thirty year amortization proposed by the debtor, is reflected at 7.64%. This would be considered in the industry as a "risk free" obligation. If three percentage points were added to this rate, in keeping with the testimony of UNUM's representative, Peter Curtis, the rate would total 10.64%.

The rate now being charged by the Internal Revenue Service under 26 U.S.C. § 6621 is 9% per annum.

■ To bring all of these variables into perspective, the Court observes that at the date of the confirmation hearing the debtor's proposed rate would produce a discount factor of 9% per annum (7½% plus 1½%), while today that same proposal would produce a discount rate of 9¾% per annum (8¼% plus 1½%). This is generally less than the updated rates reflected in the aforementioned exhibits. Because the debtor is solvent and because it intends to eventually make distributions to its Allowed Interests holders, this Court cannot approve the proposed rate of 1½% over the InterFirst prime. However, in a departure from the *Loveridge* decision, and in an effort to conserve time, this Court will specify a discount rate that would be acceptable to permit confirmation of the debtor's plan. Considering the prevailing rates for a loan of equal term to that proposed in the modified plan, the quality of the security, and

the risk of subsequent default, this Court concludes that a rate of 2½% above the prime rate charged by InterFirst would be "fair and equitable" and would meet the "cramdown" test set forth in § 1129(b)(2)(A)(i)(I) and (II).

The debtor will be afforded an exclusive opportunity to further amend its plan within ten (10) days of the date of the entry of the Order, which will be prepared in connection with this Opinion, to reflect a discount rate of 2½% above the prime rate charged by InterFirst, as well as, to add interest at the contract rate to the unpaid installments of principal and interest as discussed earlier. Thereafter, the debtor will be afforded an additional period of ten (10) days to solicit the acceptance of the plan as modified consistent with this Opinion from the Allowed Interests holders. Should the Allowed Interests holders class accept these modifications, an order of confirmation will be subsequently entered by this Court.

If the debtor elects not to amend the plan as set forth hereinabove, confirmation of the debtor's modified plan, as currently filed with this Court, shall be denied.

A separate Order addressing the issues resolved in this Opinion will be entered contemporaneously herewith.