In re SCHAUMBURG HOTEL OWNER LIMITED PARTNERSHIP, an Illinois Limited Partnership, Debtor.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY,
Plaintiff,

v.

SCHAUMBURG HOTEL OWNER LIMITED PARTNERSHIP,
Defendant.

Bankruptcy No. 87 B 14301.
Adv. No. 88 A 366.

United States Bankruptcy Court,
N.D. Illinois, E.D.

March 22, 1989.

Larry M. Wolfson, Barbara S. Steiner, David M. Neff, Jenner & Block, Chicago, Ill., for plaintiff.

Malcolm M. Gaynor, Richard M. Bendix, Jr., Bruce C. Dopke, Schwartz, Cooper, Kolb & Gaynor, Chtd., Chicago, Ill., for defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary case came on for trial. Evidence and stipulations of fact were admitted and considered. Both parties rested and the Court heard final argument. A post trial stipulation was filed by the parties as to post-petition payments by Debtor to Connecticut General. Now therefore the Court makes and enters the following Amended Findings of Fact and Conclusions of Law and withdraws the original Findings and Conclusions entered December 28, 1988. The Complaint seeks declaration that Plaintiff's liens on Debtor's affected property are perfected valid first priority liens (an assertion not in dispute), and that Plaintiff's claim be fixed in amounts prayed for. Debtor's motion consolidated for trial with this Adversary Complaint sought determination of the extent of the secured lien of Connecticut General. The trial issues surrounded questions as to value of the secured claim.

Pursuant to the following Amended Findings and Conclusions, the Plaintiff Connecticut General is separately ordered to tender proposed final Judgment Order disposing of all issues in this case and in Debtor's motion referred to hereinabove.

### FINDINGS OF FACT

1. Connecticut General Life Insurance Company is a Connecticut corporation having its principal place of business at 900 Cottage Grove Road, Bloomfield, Connecticut (hereinafter "Connecticut General" or "creditor"). Connecticut General is a national life insurance company and institutional investor in commercial real estate.

2. Schaumburg Hotel Owner Limited Partnership ("Schaumburg", or the "Debtor") is an Illinois limited partnership with

an ownership interest in the Embassy Suites Hotel in Schaumburg, Illinois (the "Hotel").

3. Connecticut General's claim against Schaumburg arises from a certain note (the "Note") and related security documentation, copies of which have been admitted into evidence as Joint Exhibits 1 through 5.

4. On December 26, 1984, the American National Bank and Trust Company of Chicago, not individually but as Trustee under Trust No. 56265 acting at the Debtor's direction, executed a promissory note in favor of Connecticut General in the original principal amount of $16 million (the "Note"). The Note bore an interest rate of 14.7% per annum. However, interest was payable at the rate of 12% per annum for the first three years following execution of the Note. Amounts representing the excess of interest at the accrual rate over interest at the payment rate were to be added to the principal of the Debtor's indebtedness to Connecticut General. The Note was to have matured and become payable on December 1, 1992. (*See* Joint Exhibit 1.)

5. Concurrently with its execution of the Note, the Debtor executed and delivered to Connecticut General a Mortgage and Security Agreement (the "Mortgage") (*see* Joint Exhibit 2), a separate Security Agreement (*see* Joint Exhibit 3), an Assignment of Rents and Leases (*see* Joint Exhibit 4), and an Assignment of the Debtor's Management Agreement with Entrust Management Company (*see* Joint Exhibit 5) to secure the Debtor's performance of its obligations to Connecticut General under the Note.

6. Connecticut General and the Debtor have stipulated and the Court finds that the agreements identified as Joint Exhibits 2–5 have provided Connecticut General with valid first priority liens on and security interests in the Debtor's real estate, certain tangible personal property, and rents arising out of a certain gift shop lease. (*See* Stipulation and Order Authorizing Payments to Secured Lender, Joint Exhibit 6.) Pursuant to Findings of Fact and Conclusions of Law entered by this Court on January 12, 1989 pertaining to contested matters in Debtor's related bankruptcy case No. 87 B 14301, the lien of Connecticut General applies to all sources of Debtor's business cash flow from and through the Hotel. Those Findings and Conclusions are adopted and incorporated herein by this reference.

7. Connecticut General and Debtor have stipulated that Connecticut General subsequently perfected each of its liens and security interests by due recordation and filing. (*See* Stipulation and Order Authorizing Payments to Secured Lender, Joint Exhibit 6; U.C.C. financing statements, Joint Exhibit 7.)

8. On September 11, 1987, Connecticut General sent Debtor a notice under which it elected to declare the entire mortgage indebtedness immediately due and payable. (*See* Joint Exhibit 8.)

9. Connecticut General filed a mortgage foreclosure suit against the Debtor in the Circuit Court of Cook County, Illinois, on September 28, 1987.

10. On September 30, 1987, the Debtor commenced its present pending related Chapter 11 proceedings.

11. The parties stipulated in a Joint Pretrial Statement filed on July 5, 1988 that as of September 30, 1987, Connecticut General held a claim against the Debtor in the amount of $17,957,319.68, calculated as follows:

| Description | Amount |
|---|---|
| Principal (including 2.7% per annum accrued interest through 9/11/87) | $17,212,162.43 |
| Interest through 9/11/87 at 12% per annum | 582,381.57 |
| Late fees | 1,500.00 |
| Default interest from September 12, through September 19, 1987 at 19% per annum | 161,275.68 |
| TOTAL: | $17,957,319.68 |

12. Under the terms of the Note, all accrued but unpaid interest was to be added to principal. Thus, on September 30, 1987, the principal amount of Connecticut General's claim was $17,955,819.68, calculated as follows:

| | |
|---|---|
| Total Claim | $17,957,319.68 |
| minus late fees | (1,500.00) |
| Principal Indebtedness | $17,955,819.68 |

13. The Promissory Note executed by the Debtor provides a contract rate of interest at 14.7% per annum. It further provides that upon the Debtor's default, Connecticut General is entitled to be paid simple interest at the default rate of 19% annually.

14. The Promissory Note and Mortgage and Security Agreement executed by the Debtor in favor of Connecticut General provided that Connecticut General is entitled to ten percent of the outstanding indebtedness as liquidated damages upon prepayment due to the Debtor's default and acceleration of the indebtedness.

15. Assuming that Connecticut General is entitled to its contractual rate of interest of 14.7% on the unpaid balance of Connecticut General's Note ($17,212,162.43) during the post-petition period, that interest totals $2,433,239.02 to September 15, 1988 (daily interest of $6,932.02 multiplied by 351 days). Before applying payments by Debtor to Connecticut General referred to in Findings 17 and 18, the sum of such post-petition interest and the principal amount of Connecticut General's claim as of that date (post-petition interest plus claim as of date bankrutpcy was filed, Finding No. 11) was $20,390,558.70. The latter sum exceeds the fair value of Connecticut General's collateral interest in the Hotel found hereinbelow.

16. Assuming that Connecticut is entitled to its contractual default rate of interest of 19% on the unpaid balance of Connecticut General's Note ($17,212,162.43) during the post-petition period, that post-petition interest totals $3,144,875.76 to September 19, 1988 (daily interest of $8,959.76 multiplied by 351 days). Before applying payments by Debtor to Connecticut General referred to in Findings 17 and 18, the sum of such post-petition interest and the principal amount of Connecticut General's claim as of that date (post-petition interest plus claim as of date bankruptcy was filed, Finding No. 11) was $21,102,195.44. The latter sum also exceeds the fair value of Connecticut General's collateral interest in the Hotel as found hereinbelow.

17. (a) On March 24, 1988, the Court entered an agreed order under which the Debtor agreed to make post-petition payments to Connecticut General and Connecticut General agreed to forbear at that time from seeking relief from the automatic stay in order to continue to prosecute its foreclosure proceeding in state court. Connecticut General also withdrew at that time but without prejudice its then pending motion for appointment of a Trustee. Connecticut General argues that all payments to it pursuant to the foregoing agreed order were made in consideration of its withdrawal of motions at that time "as consideration for Connecticut General's forbearance from prosecution of its motions." No evidence supports that argument at all let alone by a preponderance of evidence. The agreed order itself did not so provide and no other related evidence was offered on this point. To the contrary, it is clear that Connecticut General withdrew its motions in return for a cash flow against the debt due it. Indeed, it has since exercised its right to seek modification of stay, and has been at liberty to reassert the other motions as well. Accordingly, the post-petition payments by Debtor to Connecticut General pursuant to the agreed order of March 24, 1988, were to be and are applied to the Debtor's obligation to Connecticut General found hereinabove to be due.

(b) The parties stipulated before trial that Debtor made post-petition payments to Connecticut General totalling $1,151,215 from the time of entry of that Order to the time of trial in this proceeding. It was subsequently stipulated by the parties that additional payments have since been made.

18. Pursuant to post-trial stipulation of the parties filed March 9, 1989:

(a) Connecticut General and Schaumburg stipulate and the Court finds that Connecticut General has received postpetition payments from Schaumburg totalling $1,781,070.

(b) The Court finds that those payments reduce the principal (as opposed to interest) portion of Connecticut General's claim.

(c) Connecticut General and Schaumburg stipulate and the Court finds that the post-petition payments made by Schaumburg reduce Connecticut General's claim as follows:

| | INTEREST | PRINCIPAL |
|---|---|---|
| Principal Indebtedness as of 9/30/87 | | $17,212,162.43 |
| 14.7% interest between 9/30/87 and 3/3/88 (155 days) on a principal balance of $17,212,162.43, at $6,932.02 per day | $1,074,463.10 | |
| Payment received on 3/4/88 | | (180,479.00) |
| 14.7% interest between 3/4/88 and 3/23/88 (20 days) on a principal balance of $17,031,683.43, at $6,859.34 per day | 137,186.80 | |
| Payment received on 3/24/88 | | (132,190.00) |
| 14.7% interest between 3/24/88 and 4/4/88 (12 days) on a principal balance of $16,899,493.43, at $6,806.10 per day | 81,673.12 | |
| Payment received on 4/5/88 | | (151,345.00) |
| 14.7% interest between 4/5/88 and 5/10/88 (36 days) on a principal balance of $16,748,148.43 at $6,745.14 per day | 242,825.04 | |
| Payment received on 5/11/88 | | (171,800.00) |
| 14.7% interest between 5/11/88 and 6/15/88 (36 days) on a principal balance of $16,576,348.43 at $6,675.95 per day | 240,334.20 | |
| Payment received on 6/16/88 | | (161,994.00) |
| 14.7% interest between 6/16/88 and 7/12/88 (27 days) on a principal balance of $16,414,354.43 at $6,610.71 per day | 178,489.17 | |
| Payment received on 7/13/88 | | (173,809.00) |
| 14.7% interest between 7/13/88 and 8/4/88 (23 days) on a principal balance of $16,240,545.43 at $6,540.71 per day | 150,436.33 | |
| Payment received on 8/5/88 | | (179,603.00) |
| 14.7% interest between 8/5/88 and 9/14/88 (41 days) on a principal balance of $16,060,942.43 at $6,468.38 per day | 265,203.58 | |
| Payment received on 9/15/88 | | (101,357.00) |
| 14.7% interest between 9/15/88 and 12/12/88 (28 days) on a principal balance of $15,959,585.43 at $6,427.56 per day | 179,971.68 | |
| Payment received on 10/13/88 | | (162,115.00) |
| 14.7% interest between 10/13/88 and 11/20/88 (39 days) on a principal balance of $15,797.470.43 at $6,362.27 per day | 248,128.53 | |
| Payment received on 11/21/88 | | (162,288.00) |
| 14.7% interest between 11/21/88 and 12/11/88 (21 days) on a principal balance of $15,635,182.43 at $6,296.91 per day | 132,235.11 | |
| Payment received on 12/12/88 | | (164,017.00) |
| 14.7% interest between 12/12/88 and 1/18/89 (38 days) on a principal balance of $15,471,165.43 at $6,230.85 per day | 236,772.30 | |
| Payment received on 1/19/89 | | (1,623.00) |

| | INTEREST | PRINCIPAL |
|---|---|---|
| 14.7% interest between 1/19/89 and 2/14/89 (27 days) on a principal balance of $15,469,542.43 at $6,230.20 per day | $168,215.40 | |
| Payment received on 2/15/89 | | $(38,453.00) |
| 14.7% interest between 2/15/89 and 3/13/89 (27 days) on a principal balance of $15,431,089.43 at $6,214.71 per day | 167,797.17 | |
| TOTAL INTEREST | $3,503,731.53 | 3,503,731.53 |
| DEFAULT INTEREST (up to 9/30/87) | | 743,657.25 |
| TOTAL INDEBTEDNESS AS OF MARCH 13, 1989 | | $19,678,478.21 |

19. Pursuant to Court Order, Schaumburg granted Connecticut General post-petition liens on and security interests in each of those assets of Schaumburg on which Connecticut General held a pre-petition lien or security interest pursuant to the Note and the related security documents (Joint Exhibits 1–5), with the same validity and priority it had pre-petition, which liens and security interests were to constitute additional security for Connecticut General's claim against Schaumburg.

### Value of Hotel

20. The Debtor introduced into evidence at trial a fair market appraisal of the Hotel, which reflected that the fair market value of the Hotel was $21 million. (*See* Schaumburg Exhibit 1.). That appraisal was a thorough, competent analysis of the Hotel's value.

21. The fair market value appraisal assumed an orderly marketing and sale of the property within three months to one year of it being offered for sale. The amended plan filed by the Debtor on September 14, 1988 does not contemplate a sale until at least three years after confirmation. The Court finds that the fair market appraisal of $21 million accurately represents the current gross market value of the Debtor's property.

22. In assessing the fair market value of the property, the Court must consider the costs of sale of the property. In arguing to the contrary, Connecticut General points out that the Debtor's amended plan proposes that the Debtor will hold and continue to operate the Hotel for at least three years, and that in the event of a default, the Debtor will execute and deliver to Connecticut General a deed in lieu of foreclosure. Accordingly, they say there should be no significant costs of disposition for at least three years and then no costs of disposition under the Debtor's amended plan. Likewise, Connecticut General's plan proposes that Connecticut General will take possession of the property in satisfaction of its debt if it is unable to sell the property within one year of its plan's effective date. As a result, Connecticut General contends that no significant costs of disposition may be incurred under either plan. However, the present value of the property as appraised assumes a sale through normal marketing efforts in a period of three to twelve months. That value therefore assumes costs of a real estate broker and related sale costs of approximately 3% of the $21 Million fair market value, or $630,000. Subtracting those costs from the $21,000,000 valuation, the net present fair market value of the property is $20,370,000 and that is the value found by this Court for the Hotel property.

23. The Debtor offered its valuation analysis based on the assumption that the property would have to be sold in three years for $21,000,000, notwithstanding evidence that the fair market value of the property at that time will be $23.5 to $24 million. Based on the assumption of a forced sale at $21 million in three years,

Debtor calculated a revised present market value of only $19.2 million. The Court rejects that analysis and valuation as arbitrary and unpersuasive. First it disregards the likely value of $23.5 to $24 million three years hence. Second, it assumes that Debtor may artificially devalue its property by proposing a plan for future forced sale and then compute a discounted present value that is lower than the actual present value. By such logic, any debtor could produce a plan for future property sale at a low price, then argue that for purposes of its plan the present discounted value is depreciated. Such anticipated depreciation of a property actually worth far more today is neither logical nor real. While this Court values the property for purposes of Debtor's plan (see Conclusions of Law below), that does not permit Debtor to reduce that value artificially by proposing a plan for future sale at a future price which will be below value at that time and thereby compute a present discounted value below the actual present value. The essence of Debtor's plan is that the property will be sold during or after the next three years. The evidence is that it could be sold within three to twelve months by proper marketing for a price of $21 Million. That price, less costs of sale, fixes the true present value of the Property.

24. The Court has considered but rejected Connecticut General's argument that Laventhol & Horwath's fair market value appraisal "relied primarily" on the income approach to valuation. Under that approach, the appraisers concluded that the property was worth $21 million *after* deducting $800,182 (3% of value) for costs of sale. (*See* Schaumburg Exhibit 1 at 66.) Since these costs of sale will not arise for at least one year and may not arise at all under either proposed plan, Connecticut General argues that the fair market value of the property is a net $21,000,000, exclusive of the costs of sale, and that the fair market value of the property prior to considering costs of sale would be higher. However, this Court finds the appraiser's valuation analysis based on sales of comparable properties to be far more persuasive, particularly in view of the uncertain and

somewhat speculative assumptions built into the appraisal by analysis of income. Therefore, valuation must be computed net of costs of sale as provided hereinabove.

25. Remarks by the Court at the conclusion of the trial, and any fact findings contained in the Conclusions of Law hereinbelow, will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

1. The Court has core jurisdiction over this matter because it arises under the Bankruptcy Code, 28 U.S.C. § 1334(b), and because it is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B) and (K). Venue is proper in this District under 28 U.S.C. § 1409(a).

### Valuation of the Hotel

2. Connecticut General is not entitled to interest, costs or fees in excess of the reasonable value of its collateral. 11 U.S.C. § 506(a). *United Savings Association v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988).

3. "The legislative history of § 506(a) indicated that no fixed formula exists for establishing the value of collateral. Congress did not necessarily contemplate the use of forced sale or liquidation value; nor is fair market value always appropriate. 'Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case.' H.R.Rep. No. 95–595, [95th Cong. 1st Sess.], at 356, 5 U.S.Code Cong. & Admin. News at 6312. Value should be determined by the purpose of the valuation and the proposed disposition or use of the property." *Barash v. Public Finance Corp.*, 658 F.2d 504, 512 (7th Cir. 1981). In this case, the proposed use is temporary operation followed by sale.

4. The value of collateral, for purposes of § 506(b), should be determined by the amount which would be obtained from the most commercially reasonable disposition practicable under the circumstances. *E.g. In re Klein,* 10 B.R. 657, 660 (Bankr.E.

**950**

D.N.Y.1981); *Savloff v. Continental Bank,* 4 B.R. 285, 287 (Bankr.E.D.Pa.1980).

5. The property valuation standard required by the foregoing "commercial reasonableness" test will sometimes result in a value somewhere between "distress" and retail valuation. *In re Lampert,* 61 B.R. 785, 788 (Bankr.W.D.Wis.1986); *In re Damron,* 8 B.R. 323, 326 (Bankr.S.D.Ohio 1980). However in this case the most commercially reasonable disposition practicable under the circumstances is temporary operation by Debtor with an orderly marketing effort to be followed by sale. That effort will most likely produce the net fair market value found by this Court hereinabove, a value of $20,370,000.

### Value of Secured Claim

■ 6. Claims filed in bankruptcy are *prima facie* presumed valid under 11 U.S. C. § 502(a) and are *prima facie* proof of their validity under Bankr.R. 3001(f). *See In re Fogelberg,* 79 B.R. 368, 372 (Bankr.N. D.Ill.1986). Schaumburg therefore bears an initial burden of proof to overcome the presumed validity and amount of Connecticut General's secured claim. However that burden is easily satisfied, and the ultimate burden of persuasion is upon claimant Connecticut General to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral which secures its claim. *See e.g. In re Lampert,* 61 B.R. 785, 787 (Bankr.W.D. Wis.1986); and *In re Horizon Mach. & Eng. Corp.,* 54 B.R. 669, 670 (Bankr.N.D. Ill.1985).

7. As of the date this cause came on for trial (September 15, 1988), principal and accrued interest, calculated at the 14.7% non-default rate set forth in the Note ($20,-390,558.70, Finding No. 15) exceeded the net fair market value of Connecticut General's collateral as found hereinabove ($20,-370,000, Finding No. 22). That loan balance was reduced by post-petition payments to $19,678,478.21 (Finding No. 18). However if the default rate of interest and prepayment premiums are applied, the total loan balance will exceed the Hotel value.

■ 8. The value of Connecticut General's secured claim is coextensive with and cannot exceed the net fair market value for the Hotel of $20,370,000. *United Savings Assoc. v. Timbers of Inwood Forest Assoc. Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 630–31, 98 L.Ed.2d 740 (1988). If the loan balance were greater than that value, Connecticut General would not be entitled as part of its secured claim to any additional interest based on the post-petition 19% default rate interest or the ten percent prepayment premium provided by the Note, nor to its requested attorney fees and litigation expenses. However, because the loan balance is found to be less than $20,370,000 it is necessary to address some of those issues.

### Default Rate of Interest

9. (a) The Debtor clearly went into default and under the terms of its undertaking became liable to Connecticut General for the 19% default rate of interest. However, Debtor argues authority holding that under 11 U.S.C. § 506(b), the Court is not always required to apply the contractual default rate of interest in determining the allowed secured claim under that provision. It cites two cases for the proposition that default interest should be allowed only when the debtor is solvent, not when debtor is insolvent. *In re 360 Inns, Ltd.,* 76 B.R. 573, 585 (Bankr.N.D.Tex.1987); *In re W.S. Sheppley & Co.,* 62 B.R. 271, 278–79 (Bankr.N.D. Iowa 1986); *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946) *reh'g denied,* 329 U.S. 833, 67 S.Ct. 497, 498, 91 L.Ed. 706.

(b) Based on one case Debtor argues that a Bankruptcy Court may consider the following criteria in connection with its determination of whether an oversecured creditor is entitled to default rate interest on its oversecured claim:

(1) whether the creditor ever faced a realistic risk of nonpayment of its debt before or during the Chapter 11 case;

(2) the relation between the default contract rate of interest and the market rate;

(3) whether the debtor proposes a long-term reorganization program which gives rise to increased risks for the creditor;

(4) whether the debtor's plan proposes to pay a dividend to equity security or interest holders; and

(5) whether the creditor has unnecessarily engaged in obstructive tactics.

*In re W.S. Sheppley & Co.*, 62 B.R. 271, 278–79 (Bankr.N.D. Iowa 1986).

(c) Debtor also relies on a case in which:

(1) the debtor (a hotel owner) was currently solvent;

(2) the debtor would have become insolvent but for the intervention of bankruptcy and the grant of relief under the Bankruptcy Code;

(3) the secured party was clearly oversecured;

(4) the debtor's plan provided for distributions to subordinate classes of claimants and interest holders; and

(5) the market rate of interest was *lower* than the non-default contract rate of interest set forth in the creditor's note.

There, the court ruled that the secured party should receive post-petition interest at the non-default contract rate of interest, rather than the default rate of interest set forth in the note. *In re 360 Inns, Ltd.*, 76 B.R. 573, 585 (Bankr.N.D.Tex.1987).

■ 10. The burden of proof to show that the default clause constitutes an unenforceable penalty rests on the Debtor. *See Pav–Saver Corp. v. Vasso Corp.*, 143 Ill. App.3d 1013, 97 Ill.Dec. 760, 764, 493 N.E. 2d 423, 427 (1986). At the outset of discussion on this point, it must be observed that Debtor did not establish its insolvency. While there is good reason to suspect that Debtor may indeed be insolvent, that has not been proved and therefore—apart from considerations discussed below—Debtor's authority cannot be relied on here.

■ 11. Section 506(b) permits an oversecured creditor to receive interest on its claim and reasonable fees, costs and charges pursuant to an agreement between the creditor and the debtor. A court should allow contractually bargained for default interest rate under § 506(b) without examining the reasonableness of these rates provided they fall within the range of acceptable rates. *See In re Skyler Ridge*, 80 B.R. 500, 511 (Bankr.C.D.Cal.1987).

■ 12. There was no evidence that the Debtor lacked an opportunity to bargain over the default rate. The inclusion of the 19% default rate of interest in the parties' agreement indicates that the Debtor agreed to it. *Id.* The fact that Debtor stipulated that the 19% default rate was applicable pre-petition tends to negate Debtors claim that the rate is unreasonable or a penalty. Indeed, the default rate here was not shown to fall outside the range of default rates applied commercially, nor does it shock the conscience of the Court.

13. Even considering the particular facts of this case, the 19% default rate is enforceable under the standards of *In re W.S. Sheppley & Co.*, 62 B.R. 271, 278–79 (Bankr.N.D. Iowa 1986). Connecticut General meets most of the *Sheppley* factors, that is (1) the creditor was oversecured when the bankruptcy was filed; (2) the creditor faces a realistic chance of non-payment before or during the bankruptcy case; (3) the debtor proposes a long-term "internal operation" type of reorganization as opposed to a relatively quick orderly liquidated; (4) shareholders (here, the limited partners) will receive distributions under the debtor's plan; (5) the creditor has not obstructed the reorganization process; and (6) the non-default contract rate of interest was not the prevailing rate at the time of default and thereafter.

14. The Debtor admits that Connecticut General has duly perfected liens in all the assets of the Debtor (with the exception of the Debtor's cash collateral). (*See* Joint Pretrial Statement at 3.) Thus, the key question is the value of the collateral, which the Court has determined to be $20,370,000. In light of that valuation as well as the stipulated amount of Connecticut General's claim on the petition date (see Findings No. 11 & 12), Connecticut General was oversecured as of that date.

15. Connecticut General has faced a substantial risk of non-payment both before and after the commencement of this bankruptcy case. Prior to the filing of the petition, the Debtor failed to make scheduled payments for July, August and September, 1987, prompting Connecticut General to declare a default. The Debtor's bankruptcy case has not obviated this risk of nonpayment. Connecticut General did not receive any post-petition payments until March, 1988, when it began to receive excess cashflow pursuant to an agreed order. However, even those post-petition payments were substantially less than the contract (let alone the default) rate of interest.[1] Further, whether Debtor can satisfy all of its obligations under the Debtor's amended plan of reorganization or some variation of it is somewhat speculative. Moreover, that plan does not contemplate any further contribution of capital by the Debtor's limited partners; Connecticut General would bear the entire risk of loss under the Debtor's plan.

16. The Debtor's amended plan proposes the Debtor's continued use and operation of the property for at least three years before any sale of the property is contemplated. Thus, for at least three years, Connecticut General would be tied to an investment with serious risks of fluctuating market value in an uncertain economy, as is evidenced by the Debtor's inability post-petition to obtain third party refinancing of the property despite numerous alleged attempts. The default rate of interest here was intended in part to protect Connecticut General from that very risk.

17. The Debtor's amended plan proposes that the limited partners retain their equity interest in the Debtor, without providing any further funding of the reorganization effort. If the hotel value goes up, they win under the plan; if that value drops, they are no worse off then they are now, but Connecticut General would lose. It would be unfair and inequitable to allow the limited partners to retain such an interest—essentially all of the up-side and none of the down-side—without permitting Connecticut General to receive its contractually bargained for default rate of interest.

18. Connecticut General has not obstructed the Debtor's reorganization efforts. It has rather sought to protect its interests through lawful efforts before this Court. Assertion of ones rights is not obstructionism.

19. Connecticut General's actual costs upon default are not disproportionate to the default rate. Peter Roby, director of problem loans for CIGNA Investments, Inc., testified that the default rate of interest is intended, in part, to compensate the company for the salaries and related costs associated with maintaining the problem loan department, including in-house legal expenses and Mr. Roby's own salary and expenses, to compensate the company for its inability to reinvest the funds the Debtor is not paying, and to compensate the company for its increased risk. Such costs are difficult to ascertain precisely, which is the reason why default rates are bargained for by lenders.

20. Connecticut General and the Debtor have stipulated that Connecticut General's post-petition default interest totals $3,144,875.76 through September 15, 1988 (daily interest of $8,959.76 multiplied by total of 350 days) and accrues at $8,959.76 each day thereafter.

21. This Court will enforce the agreement of the parties and concludes that the post-petition interest accrues at the 19% default rate.

### Prepayment Premium

22. The Debtor relies primarily on *Slevin Container Corp. v. Provident Federal Savings and Loan Association,* 98 Ill.App. 3d 646, 54 Ill.Dec. 189, 424 N.E.2d 939 (1981) to support its argument that Connecticut General is not entitled to its prepayment fee of 10%. Although not previously cited by the Debtor, a similar case which the Court has considered is *Matter*

---

1. Payments averaged substantially less than the $196,000/month in payments required at a 14.7% contract interest rate applicable to a principal balance of $16,000,000. The 19% default rate required $253,333/month in payments on that balance.

*of LHD Realty Corp.,* 726 F.2d 327 (7th Cir.1984).

23. Debtor argues that:

██ (a) As a matter of law, Connecticut General waived its right to collect "prepayment interest" on the Note by exercising its right to accelerate the maturity of such note. *See e.g., Slevin Container Corp.,* 54 Ill.Dec. at 191, 424 N.E.2d at 941.

██ (b) A liquidated damages clause is enforceable only if the amount fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and such harm is one that is incapable or very difficult of accurate estimation. *United Order of American Bricklayers and Stone Masons Union No. 21 v. Thorlief Larsen and Son, Inc.,* 519 F.2d 331, 332 (7th Cir.1975) (quoting Restatement, Second, of Contracts § 339).

(c) The prepayment "premium" fixed in the Note is an unreasonable and unenforceable penalty which charge is disallowed under Section 506(b) of the Code.

(d) In the context of this case, the default rate of interest specified in the Note represents an unreasonable penalty which is disallowed under § 506(b) of the Code.

24. In both *Slevin* and *LHD Realty,* the loan documents provided that the debtor would incur a prepayment fee if it repaid the loan amount before maturity. In neither case did the loan documents provide that upon default, the lender could both accelerate the debt and collect the prepayment fee.

25. In this case, Connecticut General and the Debtor bargained for a clause in the Promissory Note allowing Connecticut General to accelerate the debt *and* collect liquidated damages upon default:

> The [Debtor] agrees that the prepayment premium mentioned hereinabove shall be due and payable whether said payment is voluntary *or the result of prepayment created by the exercise of any acceleration clause after a default provided*

> *for hereunder or under the Mortgage or Security Documents.*

Joint Exhibit 1 at 7 (emphasis added). Because this right was specifically bargained for and agreed to by the Debtor, Connecticut General is entitled to enforce its liquidated damages clause. Such provisions should not be enforced unless clear contractual language requires it. *Village of Rosemont v. Maywood–Proviso State Bank,* 149 Ill.App.3d 1087, 103 Ill.Dec. 542, 501 N.E.2d 859 (1986). However, because the language of the prepayment clause here makes the premium "due and payable" upon default and acceleration, Connecticut General's claim to that premium arose on September 11, 1987.[2]

26. The Debtor is likewise unable to sustain its burden of proving that the liquidated damages clause is an unenforceable penalty. *See Pav–Saver Corp. v. Vasso Corp.,* 143 Ill.App.3d 1013, 493 N.E.2d 423, 427 (1986) (burden rests on party resisting enforcement of liquidated damages clause). A liquidated damages provision is enforceable if the amount is a reasonable estimate of damages for the harm caused by a breach and if the harm is incapable or very difficult to estimate accurately. *United Order of American Bricklayers,* 519 F.2d at 332 (7th Cir.1975). The intention of the parties is often a key determinant in enforcing a liquidated damages provision. *Id.*

27. In determining the validity of a prepayment clause, the court must look to the damages that the parties could anticipate at the time the parties contracted. *United Order of American Bricklayers,* 519 F.2d at 333; *In re O.P.M. Leasing Services, Inc.,* 23 B.R. 104, 111 (Bankr.S.D.N.Y. 1982). The parties are not required to make the best estimation of damages, just one that is reasonable. *United Order of American Bricklayers,* at 335. It is immaterial that the actual damages suffered are higher or lower than the amount specified in the clause. *In re United Merchants and Mfrs. Inc.,* 674 F.2d 134, 142 (2d Cir. 1982). However, if the damages are easily

---

**2.** Moreover, under Debtors proposed Plan, prepayment would occur upon sale of the property prior to the December, 1992 payoff date provided in the loan documents.

calculable or the prepayments premium greatly exceeds a reasonable upper estimate of damages, that premium will be disallowed. *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1289–90 (7th Cir.1985).

28. In this case, Connecticut General and the Debtor bargained for and agreed to a liquidated damages provision of ten percent of the outstanding indebtedness upon prepayment due to default and acceleration (although the percentage continued to decrease as the note was paid off). Peter Roby testified that this amount was used because, at the time of contracting, the date of the prepayment (*i.e.,* default and acceleration) and the rate of return available to Connecticut General at that time (*i.e.,* reinvestment opportunities) are incapable of estimation. Thus, the extent of Connecticut General's damages, specifically the difference between the 14.7% contract rate and the rate of interest available to Connecticut General upon prepayment and reinvestment, was not calculable when the parties executed the loan documents in December 1984. The figure the parties agreed upon, ten percent of the outstanding indebtedness upon default, was a reasonable estimate of the damages Connecticut General faced from the Debtor's viewpoint. Mr. Roby testified that, in light of when the Debtor defaulted (September 11, 1987) and the rates available to Connecticut General at that time (11% at best), Connecticut General would have needed a prepayment premium of $2,510,557 (rather than the $1,721,216.24 that the 10% fee provision would generate) to adequately compensate itself for prepayment. It is clear that enforcement of the parties' agreement as to a 10% prepayment premium would not effect an unlawful windfall to Connecticut General under the facts of this case.

29. Connecticut General and the Debtor have stipulated that Connecticut General's liquidated damages total $1,721,216.24. (*See* Joint Pretrial Statement at 7.) Because the liquidated damages clause is not an unenforceable penalty, Connecticut General is entitled to that amount.

### Connecticut General's Costs

30. Connecticut General and the Debtor have stipulated that Connecticut General has incurred at least $1,185.32 in costs associated with the Debtor's default. As these costs are compensable under the loan documents, the Court will add $1,185.32 to Connecticut General's claim.

31. Pursuant to the foregoing, it is clear that the secured claim of Connecticut General extends to the full value of the hotel, $20,370,000. Consequently, there is no need to consider attorneys fees incurred by it in order to determine its secured claim.

### Miscellaneous

32. The remarks of the Court at the conclusion of the trial, and any conclusions of law contained in the Findings of Fact, will stand as additional Conclusions of Law.

### CONCLUSION

A proposed final Judgment Order will be tendered by Plaintiff in accord with the forgoing, on a date set by separate order.