**In re SOUTHMARK STORAGE ASSOCIATES LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 90–51469.**

United States Bankruptcy Court, D. Connecticut.

Aug. 6, 1991.

Leighton Aiken, Joyce W. Lindauer, Johnson, Bromberg & Leeds, Dallas, Tex., for debtor.

Cong., 2d Sess. 65 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5963, 6310, 5851.

Lisa J. Paris, Mary Anne B. Tillona, Murtha, Cullina, Richter and Pinney, Hartford, Conn., for Southmark Prime Plus, L.P.

## MEMORANDUM AND ORDER ON MOTION FOR VALUATION OF PROPERTY UNDER CODE § 506(a)

ALAN H. W. SHIFF, Bankruptcy Judge.

### I.

The debtor, a Texas limited partnership, was formed on November 23, 1987, for the purpose of, *inter alia,* purchasing for $3,375,000.00 the A–Quality Mini-Warehouse Storage Facility ("the property"), located in Stone Mountain, DeKalb County, Georgia. On December 4, 1987, the debtor executed a $2,327,242.00 promissory note to Southmark Prime Plus, L.P. ("Prime Plus") and granted Prime Plus a first priority lien on the property.[1] The debtor subsequently defaulted on the note and, on August 6, 1990, filed a chapter 11 petition.

On October 24, 1990, Prime Plus filed a proof of secured claim for $2,234,397.07. On April 26, 1991, the debtor filed the instant motion seeking a determination under Code § 506(a) that the value of the property is $1,800,000.00. On May 2, 1991, Prime Plus filed an objection, and now contends that the property has a value of $2,525,000.00. Although both the debtor and Prime Plus have used the cost method, under which the replacement cost of property is estimated to determine that property's value, and the sales comparison method, under which the value of the property being appraised is estimated using data from actual sales of comparable properties, both agree that an income method of valuation is superior because the property is income producing. There are two income methods: discounted cash flow analysis and direct capitalization. Both methods analyze the relationship between the income a property generates and its overall value.

### II.

■ Code § 506(a) provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The debtor bears the initial burden of overcoming the presumption that the amount of Prime Plus' secured claim is as stated in its proof of claim, but the ultimate burden of persuasion is upon Prime Plus to demonstrate by a preponderance of the evidence the value of the collateral which secures its claim. *E.g., Central Rubber Prod., Inc. v. Stafford Higgins Indus., Inc. (In re Central Rubber Prod., Inc.),* 31 B.R. 865, 867 (Bankr.D.Conn.1983); *Connecticut General Life Ins. Co. v. Schaumburg Hotel Owner Limited Partnership (In re Schaumburg Hotel Owner Limited Partnership),* 97 B.R. 943, 950 (Bankr.N.D.Ill. 1989).

### A.

#### Discounted Cash Flow Analysis

There are three steps in the discounted cash flow analysis: (1) the net operating income is estimated for each year of a projection or holding period; (2) a reversion, *i.e.,* a selling price at the end of the holding period, is estimated; and (3) the net operating income for each year of the holding period and the reversion are discounted to present value.

Net operating income equals gross income less expense; no adjustment is made for debt service. I note that both parties treat items such as discounts and collection losses as deductions from potential gross income rather than as expense.

---

1. Both the debtor and Prime Plus were syndicated by Southmark Corporation.

The reversion is calculated by capitalizing the net operating income for the year following the final year of the holding period. The capitalization rate reflects the rate of return expectations of a typical investor. The net operating income for the reversion year is divided by the capitalization rate to produce the reversion value.

The net operating income for each holding period year and the reversion are discounted to present value by dividing each by one plus a discount rate adjusted to reflect the appropriate time period. The discount rate reflects the time value of money given the risk of an investment and potential alternative investments.

Using a five year holding period as an example, the present value calculation is as follows:

$$PV = \frac{NOI_1}{(1+r)^1} + \frac{NOI_2}{(1+r)^2} + \frac{NOI_3}{(1+r)^3} + \frac{NOI_4}{(1+r)^4} + \frac{NOI_5}{(1+r)^5} + \frac{\frac{NOI_6}{cr}}{(1+r)^6},$$

where NOI is net operating income, r is the discount rate, and cr is the capitalization rate.

### B.

### *Net Operating Income*

Prime Plus and the debtor use a five year holding period. The following are the parties' estimates of net operating income (NOI):

|  | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Prime Plus: | $238,233 | 267,189 | 280,548 | 290,575 | 309,304 | 324,679 |
| Debtor: | 206,959 | 201,623 | 211,139 | 221,131 | 231,622 | 242,638 |

The parties are essentially in agreement on the amount of expense, which I find as follows:

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| $140,071 | 146,250 | 153,625 | 161,275 | 169,300 | 177,800 |

Thus, the different estimates of NOI are a result of the parties' disparate estimates of gross income:

|  | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Prime Plus: | $377,299 | 413,735 | 434,422 | 456,443 | 478,950 | 502,898 |
| Debtor: | 347,146 | 347,701 | 364,503 | 382,146 | 400,670 | 420,121 |

First, the parties disagree on the potential gross income of the property, *i.e.*, the revenue received if all of the storage units are leased: the debtor estimates $454,116.00 for year 1, while Prime Plus estimates $464,856.00. The bulk of the $10,740.00 difference, $9,036.00, results from the parties disagreement as to how many units are currently rentable.[2] According to the debtor, four 5 × 10 units, with a total potential rent of $1,776.00 per year, have water problems and are not currently rentable and eleven 10 × 30 units, with a potential rent of $15,180.00 per year, have water problems and are only partially rentable for $7,920.00 per year. Prime Plus recognizes those problems but supports the inclusion of the full rental value of those units by assuming that they will be repaired and deducting $6,000.00 for that purpose. However, Prime Plus' expert merely testified on several possible methods of repair and their estimated cost. He was vague as to the specific nature of the problem. For example, he stated that there may or may not be some "below-slab issues" which contribute to the moisture, and stated that he could not develop a cost to cure such a problem. Thus, there is no persuasive evidence that the moisture problem is curable. Moreover, even assuming the problem is curable, there is no evidence that the debtor plans to undertake any repairs. Accordingly, I find the debtor's treatment of the damaged units to be more persuasive, and conclude that a reasonable estimate of potential gross income for year 1 is $455,268.00.

A second disparity is the projected growth rate of the potential gross income over the entire period. Predictions of future growth cannot be verified with certainty, as growth depends on a multitude of local, national, and international factors. The parties agree that 5% is an appropriate growth rate, but disagree on when the growth will commence: the debtor argues that there will be zero growth in the first year, while Prime Plus contends that the 5% rate will pertain during the entire holding period and the reversion year. Prime Plus' expert testified that an assumption of 5% growth from year 1 to year 2 is justified by the existence of inflation, the expected population increase in the area during year 1, and the absence of any new storage facilities opening in year 1. The debtor's expert did not rebut Prime Plus' inclusion of an inflation factor, and agreed that population is increasing and that no new storage facilities are planned. He justified his assumption of 0 growth in year 1 with general statements that the economy is sluggish and rates are declining. While I recognize that there may be little if any growth during the first year, I am persuaded by the testimony of Prime Plus' expert that there will be an average growth of 5% over the six years and find that the following are reasonable estimates of potential gross income for years 2 through 6:

| 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|
| 478,031 | 501,933 | 527,030 | 553,381 | 581,050 |

A third disparity is in "other income", *i.e.*, proceeds from the collection of late fees and the auctioning of abandoned property. The debtor argues that other income will be $15,000.00 in year 1, but based that estimate on the $15,789.00 in other income collected in an eleven month period from October, 1989 to August, 1990. *See Debtor's Report*, at 74. If one average month is added to that eleven month total, the debtor's estimate of other income would be $17,224.00 for year 1, which is very close to Prime Plus' estimate of $17,500.00. Also, the debtor assumed 5% growth in other income in year 1 and zero growth in years 2 through 6, in contrast to its assumption

2.  Other differences are minimal, *e.g.*, the debtor claims there are 43 10 × 25 units and Prime Plus claims there are 45. In these instances, I adopt the average value.

for the growth of potential gross income. This apparent contradiction was not explained. Using Prime Plus' estimate of other income for year 1 and a 5% growth rate, I find that reasonable estimates of other income are:

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| $17,500 | 18,375 | 19,294 | 20,258 | 21,271 | 22,335 |

A fourth disparity is the level of collection loss. The debtor used data from its experience at the property and conversations with owners and operators of storage facilities nationwide as a basis for projecting that the property will experience a collection loss of 5% per year. Prime Plus offered no support for its assertion that the collection loss will be only 2.5%. I adopt the debtor's projection.

A fifth disparity is the vacancy rate. The debtor estimates that the property will experience 19% vacancy over the six year period, while Prime Plus estimates that the vacancy will be 11.5% in year 1 and 7.5% in years 2 through 6. The debtor's vacancy estimate is contradicted by its own data, which shows an average vacancy rate of approximately 14% from October, 1989 through September, 1990, *see Debtor's Report*, at 74, and the debtor's statements that the demand for short-term storage should increase in the future, *see Debtor's Report*, at 8, and no new storage facilities are being planned in the surrounding area. Upon cross-examination, the debtor's expert stated the DeKalb County's population is expected to increase by approximately 80,000 in the next five years. Prime Plus supports its estimate with the prediction that demand for short-term storage will grow during the next five years, and assertions that the occupancy in other area storage facilities ranges from 70% to 95%, with an average of 86%, that the property has been 82% to 87% occupied over the last 18 months, and that no new storage facilities are being planned in the area. It is illogical to conclude that vacancy at the property will increase from its recent average of 14% to 19% when the population of the area is rising and no new storage is available. Therefore, I find Prime Plus's vacancy estimate more persuasive and adopt a vacancy rate of 11.5% for year 1 and 7.5% for years 2 through 6.

A sixth difference is the estimated rental concessions used to attract business. Based on past experience, the debtor estimates 2%, while Prime Plus estimates 10%. According to Prime Plus' report, the only meaningful discount now available at the property is 33% for the first two or three months. Assuming an eight month occupancy period, which the debtor's expert testified was typical, this discount translates to 8.33% if the discount is for two months and 12.5% if it is for three months. Prime Plus also asserts that this discount is fairly typical in the area market. Therefore, I accept the concession rate of 10%.

Based on all of the foregoing, I find that the following are reasonable estimates of gross income from the property.[3]

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| $359,634 | 394,824 | 414,566 | 435,294 | 457,059 | 479,912 |

---

**3.** Gross income is calculated as follows: [ (potential gross income) × (vacancy + collection loss) × (discounts) ] + (other income)

Subtracting expenses, I find that reasonable estimates of NOI are:

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| $219,563 | 248,574 | 260,941 | 274,019 | 287,759 | 302,112 |

## C.
### Discount Rate and Capitalization Rate

The parties are essentially in agreement on the appropriate discount rate. The debtor contends that the appropriate rate is in the range of 13.0% to 13.5%, while Prime Plus contends that it is in the range of 12.5% to 13.0%. I adopt 13.0% as an appropriate discount rate.

The debtor uses a capitalization rate of 12%, see *Debtor's Report*, at 81; *Debtor's Letter*, while Prime Plus uses a capitalization rate of 10.75%. A significant portion of this difference is attributable to the differing equity yield rates, *i.e.*, the yield an equity investor would expect given the perceived risk and the potential alternative investments, used in the equity portion of the capitalization rate computation. The debtor uses 15% and Prime Plus uses 12.75%. I am persuaded by the testimony of the debtor's expert, Debtor's Exhibit 8, and Prime Plus' own admission that a 12.75%

equity yield rate is inconsistent with the 13% discount rate which Prime Plus contends is appropriate. Prime Plus' discounted cash flow estimate of value is $2,570,000.00. It contends that a typical investor would take a 70% mortgage position in the property, *i.e.*, $1,799,000.00, and a 30% equity position, *i.e.*, $771,000.00. Using Prime Plus's capitalization rate and sixth year net operating income there would be a reversion of approximately $3,021,000.00. Using Prime Plus's mortgage constant of .1155 there would be annual debt service of $207,785.00 on a twenty-five year mortgage, and after five years there would be a mortgage balance of approximately $1,705,000.00. After deduction of sales expense of $90,630.00 (3% of the reversion value at the end of the period) and the mortgage balance, there would be an equity reversion of $1,225,370.00. Subtracting debt service from Prime Plus' estimates of NOI, the following cash flow figures result:

| Year | NOI | Debt Service | Cash Flow |
|---|---|---|---|
| 1 | $ 238,233 | 207,785 | 30,448 |
| 2 | 267,189 | 207,785 | 59,404 |
| 3 | 280,548 | 207,785 | 72,763 |
| 4 | 294,575 | 207,785 | 86,790 |
| 5 | 1,534,674[4] | 207,785 | 1,326,889 |

Discounting those cash flow projections to present value yields a present value of cash flow for the five years of approximately $897,863.00, which would mean a return on equity of approximately 16.5%. Thus, I am persuaded that the debtor's equity yield rate is appropriate.

I also find that the debtor's expert and his report are more persuasive with respect to the other components of the capitalization rate calculation. The debtor's 60% loan to value ratio, 40% equity to value ratio, and interest rate of 11.5% are based on a broad survey of banks. Prime Plus,

on the other hand, uses a 70% loan to value ratio, a 30% equity to value ratio, and a 10.75% interest rate based on comments from only one bank, and it lowered the interest rate of 11% quoted by that bank. Prime Plus has not satisfied its burden of proof on the capitalization rate, and I find that the debtor's 12% capitalization rate is appropriate.

## D.
### Present Value Calculation

As noted, in a discounted cash flow analysis, net operating income for some

---

**4.** The fifth year NOI figure is the actual fifth year NOI plus the equity reversion.

specified period and a reversion are discounted back to their present value, and the following formula is used:

$$PV = \sum_{n=1}^{5} \frac{NOI_n}{(1+r)^n} + \frac{NOI_6}{\frac{cr}{(1+r)^6}}$$

where is PV is present value, $NOI_n$ is the net operating income, cr is the capitalization rate, and r is the discount rate. Using the values found for each of these components, the calculation is as follows:

$$PV = \frac{219,563}{1.13} + \frac{248,574}{1.2769} + \frac{260,941}{1.4429} + \frac{274,019}{1.6305}$$

$$+ \frac{287,759}{1.8424} + \frac{302,112}{\frac{.12}{2.0819}} = \$2,103,344$$

It is noted that that number is corroborated by the alternative direct capitalization method of valuation, which, as noted, *see supra* at 2, is also employed by both parties.

### III.

Under the alternative direct capitalization method of valuation, which the debtor contends is the superior method in this case, a single year's estimate of stabilized income is converted into a value for the property. For this calculation, year 1 income computed above is used except that the stabilized vacancy and collection loss of 12.5% are employed. The calculation of the stabilized net operating income is as follows:

$$[455,268 \times .875 \times .9] - 140,075 + 17,500 = 235,949$$

This stabilized net operating income is then divided by the appropriate capitalization rate, 11.5%, which is the capitalization rate used above after adjustment downward to account for less uncertainty due to the absence of a projection into the future. The parties agree that a .5% downward adjustment is appropriate. Thus, the value of the property under this method is:

$$\frac{.235,949}{.115} = 2,051,730$$

■ Despite the debtor's assertion that the direct capitalization method is more appropriate in this case, I believe that the discounted cash flow method is superior because income does vary over the projection period, and I give the result produced by the latter method more weight in arriving at a value.

### IV.

■ For the foregoing reasons, I find that the value of the property is $2,100,000.00, and IT IS SO ORDERED.